**Gregg D. UHLRIG, Executor of the Estate of Stephanie Uhlrig, Deceased; Gregg D. Uhlrig, Individually; Benjamin J. Uhlrig, a minor child; and Anika M. Uhlrig, a minor child, Plaintiffs–Appellants,**

v.

**Robert C. HARDER, acting in his individual personal capacity and as Secretary of the Department of Social and Rehabilitative Services; Donna L. Whiteman, acting in her individual personal capacity and as Secretary of the Department of**

---

Social and Rehabilitative Services; George D. Vega, acting in his individual personal capacity and as Commissioner of Mental Health and Rehabilitative Services; Mani Lee, acting in his individual personal capacity and as Director of Mental Health Programs; and Karen Thompson, acting in her individual personal capacity and as Superintendent of Topeka State Hospital, Defendants–Appellees,

The State of Kansas, Defendant.

No. 94–3190.

United States Court of Appeals, Tenth Circuit.

Aug. 30, 1995.

William J. Skepnek of Stevens, Brand, Golden, Winter & Skepnek, Lawrence, KS (Scott J. Bloch of Stevens, Brand, Golden, Winter & Skepnek, Lawrence, KS and Daniel M. Welch of Carpenter Professional Ass'n, Topeka, KS, with him on the briefs), for plaintiffs-appellants.

Michael George, Chief of Litigation, Dept. of Social and Rehabilitative Services, Topeka, KS (Kenneth R. Smith, Litigation Atty., Dept. of Social and Rehabilitative Services, Topeka, KS, Hal E. DesJardins, Topeka, KS, and Deborah Purce–Jones, Jones & Jones, Topeka, KS, with him on the brief), for defendants-appellees.

Before EBEL, KELLY, Circuit Judges, and BRATTON,* District Judge.

EBEL, Circuit Judge.

This 42 U.S.C. § 1983[1] action challenges the decision of a number of state mental health administrators ("Defendants")[2] to terminate a special unit in a mental hospital that was reserved for the criminally insane. Plaintiff–Appellant Gregg Uhlrig ("Plaintiff"), as the executor of the estate of his deceased wife, Stephanie Uhlrig ("Uhlrig"), alleges that Defendants' reckless decision to terminate the special unit led to the placement of Kenneth Waddell ("Waddell"), a member of that special unit, into the general hospital population where Uhlrig worked as an activity therapist. Plaintiff further asserts that this chain of events ultimately caused Uhlrig's death. Thus, Plaintiff claims that Defendants are liable under § 1983 for violating Uhlrig's substantive due process rights by recklessly creating the danger that led to her death. The district court rejected this claim and ruled for Defendants on sum-

---

* The Honorable Howard C. Bratton, Senior United States District Court Judge for the District of New Mexico, sitting by designation.

1. Section 1983 provides, in relevant part, that: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983.

2. Plaintiff–Appellant originally named the State of Kansas as a defendant, but the district court dismissed the claims against the state on Eleventh Amendment grounds. Thus, as Plaintiff–Appellant does not contest that decision, the state is not a party to this appeal.

mary judgment, determining that Plaintiff failed to demonstrate that Defendants acted recklessly, and that, in any event, Defendants' qualified immunity shielded them from liability. We affirm.[3]

## I. BACKGROUND

Uhlrig worked as a music and activity therapist at the Topeka State Hospital. One of the patients at Topeka State Hospital was Waddell, who had been placed in the custody of state mental health authorities after having been found not guilty by reason of insanity for the charge of aggravated battery. Waddell was initially placed in the Larned State Security Hospital, but on April 1, 1987, he was transferred to the Topeka State Hospital where he was placed in the Adult Forensic Ward (referred to as the "AWL unit"), which was a special unit secluded from the other units because it contained higher risk patients. After three months in the AWL unit, Waddell's treatment team recommended that the hospital place him into a regular unit. However, after over a year in a regular unit, the hospital transferred Waddell back to the AWL unit because he had gone AWOL (and then voluntarily returned to the hospital) and the County Attorney who originally prosecuted him complained of Waddell's AWOL and requested that the hospital provide greater security. In March of 1991, while back in the AWL unit, Waddell had a physical altercation with a staff member and was placed in restraint.

Due to budgetary constraints, Robert Harder, Acting Secretary of the Department of Social and Rehabilitative Services, and George Vega, Acting Commissioner of Mental Health and Retardation Services, decided to close the AWL unit. Dr. Mani Lee, Director of Mental Health Services, informed both Vega and Harder in a detailed memorandum that, as the AWL unit had been specially created to avoid mixing "murderers with my mother" and to serve high risk patients in a highly structured environment,

a careful phase-out period would be necessary were the AWL unit to be closed. On June 21, 1991, Vega authorized Karen Thompson, who was the Acting Supervisor of Topeka State Hospital at the time of the phase-out, to close the AWL unit "in the most expeditious manner possible" so as to place the AWL patients into other appropriate wards. To administer the phase-out of the AWL unit, the hospital's Patient Care Consultation Team ("PCCT") met with the AWL treatment team and consulted with the nursing staff to determine where to place the patients who resided in the AWL unit. Defendants emphasize that they personally were not involved in the outplacement process from the AWL unit and did not examine the files of those residing in the unit, but rather broadly delegated this task to those with clinical expertise. Thus, none of the defendants personally participated in the process of determining where or how to outplace Waddell.

As a result of the phase-out, the PCCT recommended that the hospital transfer Waddell to Rappaport South, the unit in which he resided prior to being referred back to the AWL unit. After the transfer, Waddell raped and assaulted a female patient; as a result, he was then transferred to Boisen South, another unit in the general population, where Uhlrig worked as an activity therapist. When Waddell was transferred to the Boisen South Ward, Uhlrig's supervisor, who had previously alerted Uhlrig to the general dangers inherent in her job, specifically called Uhlrig's attention to Waddell's background and confirmed with Uhlrig that she had no problem escorting Waddell off grounds and working with him. Plaintiff concedes that Uhlrig had access to Waddell's files and may have made entries in them, but claims that such access (and any such entries in Waddell's files) do not establish that she understood that Waddell could pose a threat to her safety. Furthermore, upon taking her position, Uhlrig signed a job description inform-

---

3. Plaintiff also requests that we reverse the district court's order of summary judgment because Defendants submitted additional affidavits to the district court with their Summary Judgment Reply Brief. However, because the evidence submitted therein was not necessary to support the district court's decision, we decline to reverse the district court's order on that ground. We also reject Plaintiff's counsel's motion to strike and to sanction Defendants' counsel for making material misrepresentations at oral argument.

ing her that she would work with patients who were potentially assaultive and/or combative. In addition, Sally Schaffer, who trained Uhlrig as a music therapist, stated that she also communicated to Uhlrig that Uhlrig might be harmed by some patients in the hospital. Finally, Uhlrig's training period included instruction in how to reduce the risks of injury posed by potentially violent patients.

On February 23, 1992, Uhlrig and another therapist took Waddell and other patients off grounds to watch a movie. Upon returning to the hospital and dropping off the other patients, Waddell attacked and killed Uhlrig, and her body was found in the bathroom in one of the buildings on the grounds. Uhlrig's estate and heirs then brought this action predicated upon her substantive due process rights as well as a number of pendent state law tort claims. The district court dismissed Plaintiffs' state law tort claims as barred both by the Kansas worker's compensation laws and by Defendants' discretionary function immunity under Kansas law. Moreover, the district court dismissed the State of Kansas as a defendant on Eleventh Amendment grounds, and it dismissed Uhlrig's husband and children as plaintiffs (in their role as surviving family members), and only allowed Uhlrig's estate to proceed in this action.[4]

Finally, the district court granted Defendants' motion for summary judgment on Plaintiff's § 1983 claim, ruling that (1) Defendants' actions were not reckless; and (2) in any event, they were protected by their defense of qualified immunity. In ruling that Defendants were not reckless, the court concluded that (1) Defendants did not know of the danger that Waddell posed to Uhlrig; nor (2) did Defendants willfully conceal any evidence of that danger or mislead Uhlrig. In fact, the court found that Uhlrig understood the potential dangers she faced at work. Plaintiffs now appeal.

## II. DISCUSSION

In granting Defendants' motion for summary judgment based on qualified immunity,

the district court correctly followed the approach set forth in *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). That is, the court first determined that, under the facts of the instant case, Plaintiffs failed to state an actionable claim, and then concluded that, even if Plaintiff's claim was actionable, it was not clearly established under the law of the Tenth Circuit. In reviewing the district court's rulings, we also follow the approach set forth in *Siegert,* and affirm.

We review the district court's grant of summary judgment by applying the same legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c). *Universal Money Ctrs., Inc. v. AT & T,* 22 F.3d 1527, 1529 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994); *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990). That is, we first consider whether there is a genuine issue of material fact in dispute; if not, then we must determine if the district court correctly applied the substantive law. *Applied Genetics,* 912 F.2d at 1241. In determining whether there is a genuine dispute of material fact, "we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics,* 912 F.2d at 1241.

In order to prevail on their substantive due process claim, Plaintiffs must demonstrate that the state acted in a manner that "'shock[s] the conscience.'" *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 126, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992) (quoting *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952)). Moreover, as the conduct complained of in the instant case was committed by a private third party (i.e. Waddell) rather than by a state actor, Plaintiff must demonstrate either (1) the existence of a special custodial relationship between the plaintiff and the state; or (2) that the state recklessly created the danger that caused the constitu-

---

**4.** Plaintiff accepts these adverse rulings and solely appeals the ruling dismissing the estate's

§ 1983 claim.

tional violation. *See Graham v. Independent Sch. Dist. No. I–89,* 22 F.3d 991, 994–95 (10th Cir.1994). Here, Plaintiff relies on the danger creation theory to meet the state action requirement. However, we conclude that the district court properly granted summary judgment to Defendants because Plaintiff failed to raise a genuine dispute of fact that Defendants (1) recklessly created the danger that led to Uhlrig's death; or (2) acted in a "conscience shocking" manner.

## A. State Action Requirement

■ While state actors are generally only liable under the Due Process Clause for their own acts and not for private violence, *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 196–97, 109 S.Ct. 998, 1003–04, 103 L.Ed.2d 249 (1989),[5] there are two recognized two exceptions to this rule: (1) the special relationship doctrine; and (2) the "danger creation" theory. A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient). *See id.* at 199–200, 109 S.Ct. at 1005 (explaining that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being"). This theory is inapplicable to the instant case because Uhlrig was simply an employee of the state working at the Topeka State Hospital, and an employment relationship is consensual in nature.

A state also may be liable for an individual's safety under a "danger creation" theory if it created the danger that harmed that individual—that is, provided that the other elements of a § 1983 claim have been satisfied. *See Medina v. City and County of Denver,* 960 F.2d 1493, 1495–99 (10th Cir. 1992) (explaining that police officers who engaged in a high speed car chase could be liable for creating a special danger faced by a bicyclist, but were protected in that case by their shield of qualified immunity).[6] The classic case of state actors creating a danger so as to give rise to § 1983 liability is *Wood v. Ostrander,* where police officers placed plaintiff in danger by impounding her car and abandoning her in a high crime area at 2:30 a.m., thereby "distinguish[ing] Wood from the general public and trigger[ing] a duty of the police to afford her some measure of peace and safety." 879 F.2d 583, 589–90 (9th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990).

However, many state activities have the potential for creating some danger—as is true of most human endeavors—but not all such activities constitute a "special" danger giving rise to § 1983 liability. For the state to be liable under § 1983 for creating a special danger (i.e. where a third party other than a state actor causes the complained of injury), a plaintiff must allege a constitutionally cognizable danger. That is, the danger creation theory must ultimately rest on the specifics of a substantive due process claim—i.e. a claim predicated on reckless or intentionally injury-causing state action which "shocks the conscience."[7] As explained by

---

**5.** This general rule is rooted in the text of the Fourteenth Amendment Due Process Clause, which only applies to state actors. The Due Process Clause specifies that "... nor shall *any State* deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV (emphasis added).

**6.** *Graham* explained that "[m]any courts have noted that *DeShaney* ... leaves the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger. This state-created danger doctrine necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger." 22 F.3d at 995 (quotations omitted).

Judge Posner offered the classic and oft-quoted metaphor for a state-created danger: "[i]f a state

puts a man in a position of danger from private persons and then fails to protect him ... it is as much an active tortfeasor as if it had thrown him into a snake pit." *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982).

**7.** The Supreme Court planted the seed for such a "creation of danger" theory in explaining the case of Joshua DeShaney: "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it *played no part in their creation,* nor did it do anything to render him *any more vulnerable to them.*" *DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006 (emphasis added); *see also Medina,* 960 F.2d at 1497 n. 5 (distinguishing *DeShaney* on the grounds that it does not absolve the state of liability when the state affirmatively and directly changes the status quo

the Fifth Circuit in *Leffall v. Dallas Indep. Sch. Dist.*, "it is not enough to show that the state increased the danger of harm from third persons; the [§] 1983 plaintiff must also show that the state acted with the requisite degree of culpability in failing to protect the plaintiff." 28 F.3d 521, 531 (5th Cir. 1994). As discussed *infra*, Plaintiff here has failed to demonstrate that Defendants acted with the requisite degree of culpability or in a "conscience shocking" manner.

## B. The "Shock the Conscience" Standard

The recent case of *Collins v. City of Harker Heights Tex.*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), offers some guidance in considering the scope of substantive due process violations. There, the Court explained that the standard for judging a substantive due process claim is whether the challenged government action would " 'shock the conscience' of federal judges." *Collins*, 503 U.S. at 126, 112 S.Ct. at 1069 (quoting *Rochin*, 342 U.S. at 172, 72 S.Ct. at 209–10). In *Collins*, the representative of a decedent sued the City under § 1983 for providing an unsafe workplace when it caused a worker to enter a sewer without adequate ventilation and the worker died as a result. The Court held that the City did not violate the worker's substantive due process rights, explaining that "[t]he Due Process Clause 'is not a guarantee against incorrect or ill-advised [government] decisions.' Nor does it guarantee municipal employees a workplace that is free of unreasonable risks of harm." *Id.* at 129, 112 S.Ct. at 1070 (quoting *Bishop v. Wood*, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976)). In so ruling, *Collins* underscored the oft-repeated principle that a substantive due process violation must be more than an ordinary tort to be actionable

under § 1983. *Id.* at 128, 112 S.Ct. at 1070; *see also Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 *reh'g denied*, 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980) ("Although § 1983 has been described as a species of tort liability, it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute.") (internal quotation omitted).

In order to discern whether the facts of the instant case "shock the conscience" so as to rise to the level of a substantive due process violation, we must bear in mind three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope, *Collins*, 503 U.S. at 125, 112 S.Ct. at 1068–69; (2) the concern that § 1983 not replace state tort law, *DeShaney*, 489 U.S. at 202, 109 S.Ct. at 1006–07; *Medina*, 960 F.2d at 1495; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety, *Collins*, 503 U.S. at 128–29, 112 S.Ct. at 1070–71. Consistent with these principles and our prior cases, *see, e.g., Graham*, 22 F.3d 991; *Medina*, 960 F.2d 1493, *Collins* explained that the Due Process Clause's protection against "conscience shocking" conduct traditionally only involved deliberately wrongful government decisions rather than merely negligent government conduct. 503 U.S. at 127 n. 10, 112 S.Ct. at 1069 n. 10. *Collins'* focus on deliberateness coheres with our previous recognition that a § 1983 violation must be predicated on a state action manifesting one of two traditional forms of wrongful intent—that is, either: (1) an intent to harm; or (2) an intent to place a person unreasonably at risk of harm.[8] *Medina*, 960 F.2d at

---

by knowingly or recklessly placing the plaintiff in grave danger).

**8.** This latter form of intent is frequently referred to as "reckless" conduct. *See Medina*, 960 F.2d at 1496. It differs from the non-intentional torts of negligence or gross negligence because, in reckless conduct, the defendant recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff. *See Woodward v. City of Worland*, 977 F.2d 1392, 1399 n. 11 (10th Cir.1992) ("[R]ecklessness is generally regarded

as satisfying the scienter requirement of section 1983 because it requires proof that the defendant focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk."), *cert. denied,* —— U.S. ——, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993); *Archuleta v. McShan*, 897 F.2d 495, 499 (10th Cir.1990) ("[R]ecklessness includes an element of deliberateness—a *conscious*, acceptance of a known, serious risk.") (emphasis in original) (citation omitted); *Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir.1988) (en banc) (recklessness contains an intent component because the "reckless

1496. While "an intent to harm" follows the traditional tort law concept of intentionality, we have defined "an intent to place a person unreasonably at risk" (or reckless conduct) as when a state actor "was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences." *Id.*[9]

■ However, to satisfy the "shock the conscience" standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. That is, the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. The level of conduct required to satisfy this additional requirement cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct. We do know, however, that the "shock the conscience" standard requires a high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort and that merely allowing unreasonable risks

to persist in the workplace is not necessarily conscience shocking. *Collins,* 503 U.S. at 128, 112 S.Ct. at 1070.

## C. Did Defendants Recklessly [10] Create A Special Danger To Uhlrig That Shocks the Conscience?

Merging the above concepts and applying them to the facts of the instant case, Plaintiff must demonstrate that (1) Uhlrig was a member of a limited and specifically definable group; (2) Defendants' conduct put Uhlrig and the other members of that group at substantial risk of serious, immediate and proximate harm; (3) the risk was obvious or known; (4) Defendants acted recklessly in conscious disregard of that risk; and (5) such conduct, when viewed in total, is conscience shocking. *See Collins,* 503 U.S. at 126–30, 112 S.Ct. at 1069–71; *Medina,* 960 F.2d at 1496. At least at the summary judgment stage, Plaintiff has raised a fact issue as to the first and third factors regarding whether Uhlrig was part of a limited and specifically defined group which would face the risk posed by the closing of the AWL unit and the outplacement of Waddell; and whether Defendants knew that they were creating such a risk of harm.[11] However, Plaintiff has failed

---

disregard of a great risk is a form of knowledge or intent"), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989).

**9.** Other circuits have read *Collins* as consistent with *Medina*'s position that reckless intent suffices to give rise to § 1983 liability. *See Leffall,* 28 F.3d at 531 (deliberate indifference suffices to state a substantive due process claim); *L.W. v. Grubbs,* 974 F.2d 119, 122–23 (9th Cir.1992), *cert. denied,* ── U.S. ──, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993) (same). *But see Lewellen v. Metropolitan Gov't of Nashville and Davidson County, Tenn.,* 34 F.3d 345, 351 (6th Cir.1994) (while not specifically addressing reckless intent as defined in *Medina,* explaining that a "nonintentional tort" does not suffice to state a substantive due process claim), *cert. denied,* ── U.S. ──, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995); *Fagan v. City of Vineland,* 22 F.3d 1296, 1306–08 (3d Cir.1994) (en banc) (reckless intent does not suffice to state a substantive due process violation).

**10.** Plaintiff does not allege that Defendants acted with the intent to harm Uhlrig (or any other staff member), so here we are dealing only with the second kind of cognizable intent under § 1983—

that the state acted recklessly by deliberately placing Uhlrig (or hospital employees as a well-defined group) unreasonably at risk of the known danger posed by the threat of an assault by a former AWL unit patient when it closed the AWL unit.

**11.** Whether Defendants knew that they were creating a risk by terminating the AWL unit and outplacing Waddell (and the other former patients) presents a close question. Plaintiff argues that Defendants knew of the risk because (1) Defendants had access to Waddell's files, (2) knew that the AWL unit was created to prevent the mixing of "murderers with my mother," and (3) were warned in memoranda of the possible danger posed by reassigning some of the AWL patients. Defendants respond that the only knowledge that they possessed as to the potential danger of the closure of the AWL unit was that the process of reassignment needed to be conducted carefully and that they carefully managed the outplacement process by warning the hospital employees of any added risk and by delegating authority over the outplacement process to the clinical expertise of the PCCT. However, even with these precautions, we cannot conclusively determine that Defendants were not aware

to raise a genuine dispute of fact as to the second, fourth and fifth factors comprising a reckless creation of danger claim.

With regard to the second factor, Plaintiff did not produce evidence that the decision to close the AWL unit (and the placement of Waddell into the general hospital population) created a high probability of a serious and substantial harm.[12] While Waddell had attacked a patient before, he had also spent over a year in the general hospital population without incident. Furthermore, the fact that Defendants warned all employees of the potential risk inherent in their job, and specifically warned Uhlrig about Waddell, also lessened the general threat posed by the former AWL unit patients.[13] The evidence concerning Uhlrig's knowledge as to the dangers she faced stemmed from several sources: (1) her access to Kenneth Waddell's file; (2) the warnings provided to her in her job description; (3) the warnings provided to her during her training; (4) the discussions with her supervisor both about the general possibility of danger as well as concerning the specific background of Waddell; and (5) Kansas's standards for civil commitment.[14] We view these warnings as sufficient to minimize the risk inherent in her job,[15] so that the risk facing Uhlrig could not fairly be described as presenting a substantial risk of serious harm. Indeed, the authority presented by Plaintiff does not establish that the state must warn its employees of all risks in the workplace, but merely that if the state affirmatively misleads an employee of the substantial risks in the workplace, that action may give rise to § 1983 liability.[16]

With regard to the fourth factor, we do not believe that the creation of the risk posed by the closure of the AWL unit or the placement of Waddell into the general hospital population was reckless. That is, Defendants did not act in conscious disregard of a known and serious risk in deciding to close

---

of any risk arising from the termination of the AWL unit; thus, we would not affirm summary judgment on this ground.

12. The relevant risk can be viewed as the risk posed by all former AWL unit patients. *See Cornelius v. Town of Highland Lake, Ala.*, 880 F.2d 348, 357 (11th Cir.1989) (analyzing the risk posed to Town Hall workers by the regular use of violent offenders—as opposed to any specific violent offender—as part of a work-release program), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). However, as Plaintiff mostly focuses on the risk posed by the specific placement of Waddell into the general hospital population, our analysis also focuses primarily on the threat posed by Waddell.

13. Plaintiffs suggest that Uhlrig's knowledge of any potential danger was irrelevant as "the cause of action plaintiffs advance does not depend only on Stephanie Uhlrig not being warned, but instead relies also on the evidence that she could not defend herself" against the danger created by Defendants' reckless actions. Appellant Rep.Br. at 15. However, we view the warnings given to Uhlrig as relevant to the inquiry into whether Defendants acted recklessly for two reasons. First, with regard to the instant case, any warnings given to Uhlrig necessarily limited the danger that she faced at work because she could have taken precautions so as not to have been in a situation where she could not defend herself. Second, on a more general level, because many employment situations may contain some inherent risk, we cannot hold public employers liable under § 1983 for dangers arising from that risk if they have sufficiently warned their employees.

14. Those standards specified that an individual can be confined in a mental hospital if he or she "is likely to cause harm to self or others if not immediately detained." Kan.Stat.Ann. § 59–2909(b)(3).

15. As the Fifth Circuit explained, public employees "are under no compulsion to submit to unsatisfactory working conditions and may quit whenever they please." *Leffall*, 28 F.3d at 528. Of course, if the state misled a public employee as to his or her working conditions, this rationale would be inapplicable and the state could be held liable under § 1983.

16. *Compare Grubbs*, 974 F.2d at 121, 123 (assigning § 1983 liability based on a creation of danger theory where the employee had been led to believe that she would not work with dangerous persons and the employer then left her alone with a dangerous person); *Cornelius*, 880 F.2d at 350, 359 (holding that town clerk who was told that only non-violent inmates would participate in work program had a cause of action against town after it used a violent inmate who then attacked her) *with Collins*, 503 U.S. at 125–26, 112 S.Ct. at 1068–69 (city not liable for hazards of sewer when employer did not actively mislead the employee as to danger he faced); *Lewellen*, 34 F.3d at 347, 351 (public employer not liable for creating a dangerous situation by exposing an employee to electrocution where the employee was not misled as to the nature of the threat).

the AWL unit. To the contrary, they set up procedures to address the (arguably) known risk, delegating the assignment process to the clinical expertise of the PCCT. Moreover, we note that we must be careful not to second guess Defendants' decisions based on the benefit of hindsight, especially where their decision stemmed from a balancing of "competing social, political, and economic forces." *Collins*, 503 U.S. at 128, 112 S.Ct. at 1070. As noted by the Supreme Court, decisions concerning the allocation of resources "involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country." *Id.* at 129, 112 S.Ct. at 1070. Here, Defendants faced difficult allocational decisions precipitated by budgetary constraints, and even if their decisions created certain risks, we view them as within the province of policymakers who must balance competing concerns.

■ Finally, the fifth factor requires us to look at the conduct as a whole to determine whether it "shocks the conscience." Here, none of the defendants intended to injure Uhlrig or any other hospital staff by the decision to close the AWL unit, nor were they indifferent to the risk that would be created by such action. They established a procedure whereby trained professionals would make the actual assignments of the AWL patients. Moreover, the hospital staff members all were warned of the general risks inherent in their jobs, and Uhlrig specifically was aware of Waddell's background. Defendants did not affirmatively mislead Uhlrig about the risks that she and her fellow workers faced as a result of such choices. Defendants did not abuse their power or act in an arbitrary and oppressive manner; rather, Defendants' actions resemble those typical of legitimate governmental decisions in times of scarcity—that is, the making of difficult policy choices to reconcile various competing social, political and economic forces. Therefore, on these facts, we have no difficulty concluding that Defendants did not engage in any conduct that was so egregious, outrageous and fraught with unreasonable risk so as to shock the conscience.

## D. Qualified Immunity

■ In accordance with the approach set forth in *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991), we first concluded that Plaintiff clearly failed to satisfy the substantive requirements for stating a § 1983 claim against Defendants based on a substantive due process violation arising from the acts of a third party—i.e. a non-governmental actor. Second, to the extent that Plaintiff is asking us to extend the scope of § 1983 liability, we still would not assign § 1983 liability to Defendants because such an extension is not directly supported by any controlling precedent (and indeed, is undercut by *Medina* ). We conclude that Defendants acted in an objectively reasonable manner based on what "a reasonably competent public official [would] know [of] the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Medina*, 960 F.2d at 1498 (in order to overcome a defense of qualified immunity, a plaintiff must demonstrate that either a Tenth Circuit or Supreme Court case controls the issue or that the clearly established weight of authority supports plaintiff's claim). Thus, we also affirm the district court's judgment that Defendants are protected from liability by their shield of qualified immunity.

## CONCLUSION

While Uhlrig's murder was undeniably tragic, it was not the result of reckless and "conscience shocking" conduct by the state mental health administrators sued in the instant case. Section 1983 does not convert all harms into substantive due process violations, but rather only provides a cause of action for those reckless government actions which "shock the conscience." Here, we conclude that the record establishes that Defendants did not (1) put Uhlrig at substantial risk of serious harm; (2) act recklessly in conscious disregard of such risk; or (3) act in a "conscience shocking" manner. Thus, the district court properly granted summary judgment for Defendants both on the merits of Plaintiff's claim as well as based on Defendants' qualified immunity defense. There-

fore, we AFFIRM the district court's grant of Defendants' motion for summary judgment.