2012 COA 3

**Michael A. SHIRK and Joanna Shirk, individually and acting as parents and next friends of B.N.S., R.T.S., and B.K.S., minor children, Plaintiffs–Appellees,**

v.

**Joan FORSMARK, Cathy O'Donnell, and Angela Lytle, MSW, Defendants–Appellants.**

**No. 10CA2141.**

Colorado Court of Appeals, Div. III.

Jan. 5, 2012.

---

unchanged.

Hutchinson Black & Cook, LLC, Baine P. Kerr, Christopher W. Ford, Keith M. Edwards, Boulder, Colorado; Allen & Vellone, P.C., Jordan Factor, Denver, Colorado, for Plaintiffs–Appellees.

Hal B. Warren, County Attorney, Heidi M. Miller, Assistant County Attorney, Michelle Tyler Michel, Assistant County Attorney, Brighton, Colorado, for Defendants–Appellants.

Opinion by Judge WEBB.

The case from which this interlocutory appeal arises involves 42 U.S.C. § 1983 claims on behalf of children for injuries suffered in connection with their foster care placement and adoption. Defendants, Joan Forsmark, Cathy O'Donnell, and Angela Lytle, seek review of the trial court's orders denying their motions for summary judgment, which asserted qualified immunity for their discretionary decisions as government officials involved in the placement and adoption. We conclude that under clearly established federal law, constitutional violations have been alleged. Therefore, we affirm.

## I. Procedural History

Defendants are all employees of the Adams County Department of Social Services (Department). Plaintiffs, Michael and Joanna Shirk, filed this action individually[1] and on behalf of their adopted children, B.N.S., R.T.S., and B.K.S., who were in the Department's custody from approximately August 2000 through their adoption in August 2003. When the children were removed from their biological mother's home, B.N.S. was six years old, R.T.S. was four years old, and B.K.S. was almost one and a half years old. The Department placed the children in the foster home of Dan and Penny Staley. They remained there until November 2002, when the Department transferred them to the Shirks' home as a pre-adoption placement. At a hearing in August 2003, the court approved the Shirks' adoption of the children.

Defendants' involvement with the children during these three years was as follows:

- Forsmark was the caseworker for the children from August 2000 to November 2002. She placed them in the Staley home and later in the Shirk home.

- O'Donnell was the caseworker for the children from November 2002 to August 2003. During that time, the children were in the Shirk home. O'Donnell favored postponing the adoption.

- Lytle was the Division Director of Child Welfare for the Department from February 2002 to December 2006. In addition to supervising both Forsmark and O'Donnell, she determined that the Department would support adoption of the children by the Shirks in August, notwithstanding O'Donnell's contrary view.

- All three defendants were involved in matching the children to the Shirks and recommending that the children be adopted as a sibling group.

In January 2003, the children told the Shirks that they had been sexually abused by another child in the Staley home. Investigations by the Jefferson County Department of Human Services and the Arvada Police Department confirmed these allegations. The night before the final adoption hearing in August 2003, the children revealed to the Shirks that they had been subjected to sexual abuse in their biological mother's home and had been engaging in incestuous behavior while in the Shirk home. At that point, "The children were in emotional chaos" and B.N.S. "might be suicidal."

The section 1983 claim alleged that defendants violated the children's constitutional rights to be reasonably safe from harm during their three years in the Department's custody and that defendants increased the dangers to them during the foster-adopt placement and following their adoption. Defendants moved for summary judgment, arguing that their conduct did not amount to a constitutional violation, and, even if it did, they were entitled to qualified immunity because federal law did not clearly establish that their alleged actions violated the children's constitutional rights. In lengthy and well-reasoned orders for each defendant, the trial court rejected their position on federal law, found disputed issues of material fact, and denied these motions.

## II. Appealable Order and Standard of Review

The pivotal question in this case is our scope of review. Generally, denial of a summary judgment motion is not subject to appeal. *City of Lakewood v. Brace*, 919 P.2d 231, 239 (Colo.1996). An exception exists for denials of summary judgment motions based on qualified immunity. *Id.* But this exception includes significant limitations on appellate review.

"[Q]ualified immunity shields government officials who are performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 237–38 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity is immunity from suit, not a mere defense to liability. *Id.* It "balances two important interests—the need to hold

public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). To overcome a qualified immunity defense, the plaintiff must plead a constitutional violation, and the constitutional right allegedly violated must have been "clearly established" at the time of the action in question. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

■ When faced with a summary judgment motion based on qualified immunity, a trial court should "undertake a two-part analysis." *Brace,* 919 P.2d at 242. First, the court must determine "whether the facts—*as pled by [the plaintiff]*—sufficiently state a violation of a clearly established constitutional right." *Id.* (emphasis added). If they do not, the court need not inquire further. *Id.* Second, if the trial court finds that the plaintiff has met this burden, "it must also determine, under a summary judgment standard, if there are genuine issues of material fact such that the issue of qualified immunity must await determination by a trier of fact." *Id.*

■ As explained in *Brace:*

*The first part of the analysis is immediately reviewable, but the second part is not.* Naturally, the trial court's order may encompass both types of findings. In that event, the court of appeals reviews only the legal questions. Nevertheless, if the court of appeals finds that [the plaintiff] has not *alleged facts* from which a violation of a clearly established constitutional right can be discerned, the trial court's finding that there are issues of fact with respect to that claim is meaningless and does not preclude a grant of summary judgment.

*Id.* at 242–43 (emphasis added). Thus, "[t]he trial court's order is immediately appealable if its denial was based on a question of law,

i.e., the trial court found that there were sufficient facts pled to support a violation of a clearly established law." *Id.* at 241.[2]

Defendants' assertion that based on *Thomson v. Salt Lake County,* 584 F.3d 1304, 1313 (10th Cir.2009), we must review the summary judgment record, to determine if plaintiffs' allegations have adequate support, fails for three reasons.

First, *Thomson* reviewed entry of a summary judgment, not the interlocutory review of a summary judgment denial. Defendants cite only *Eidson v. Owens,* 515 F.3d 1139, 1145 (10th Cir.2008), as taking this approach on interlocutory appeal where summary judgment has been denied. *Eidson* is distinguishable because the court of appeals accepted appellate jurisdiction on the basis that defendant did not dispute plaintiff's version of the facts.

Second, to the extent *Thomson* conflicts with the scope of review in *Brace,* we follow *Brace* because where the section 1983 claim has been brought in state court, immediate appealability of a denial of qualified immunity is a matter of state law. *See Johnson v. Fankell,* 520 U.S. 911, 913, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997) ("defendants in an action brought under ... § 1983 in state court [do not] have a federal right to an interlocutory appeal from a denial of qualified immunity").

Third, following *Johnson,* the Colorado Supreme Court revisited section 1983 interlocutory appeals in *Furlong v. Gardner,* 956 P.2d 545, 550 (Colo.1998). The court recognized that *Johnson* had "rejected [the] analysis in *Brace* that federal case law controlled with respect to the immediate appealability of the denial of qualified framework ... announced in *Brace* continues to govern appellate review of a state trial court's denial of qualified immunity in a § 1983 case." *Id.*

Under *Brace,* we must first determine if the summary judgment order is reviewable, i.e., was it based on a question of law—

2. *See Johnson v. Jones,* 515 U.S. 304, 319–20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) ("[A] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial."); *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ("[a]n appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts").

whether the plaintiffs pleaded a clearly established constitutional right—or was it based only on a finding that genuine issues of triable fact existed. *See Brace,* 919 P.2d at 241 (we must first "construe the trial court's summary judgment order before we can ascertain what portions of the order, if any, are immediately reviewable"). Here, using substantially similar language in each order, the trial court concluded that plaintiffs' allegations invoked clearly established rights:

- "[W]hile plaintiffs have not shown specific case law delineating that each specific allegation is a constitutionally protected right, the Tenth Circuit has announced a clearly established right to be reasonably safe from harm when in state custody ... The court finds that plaintiffs' allegations regarding proper therapy, risk assessment, home visits and proper investigation and disclosure are encompassed in the right to be reasonably free from harm."

- "The court finds that the law regarding the danger creation theory was clearly established at the time these incidents occurred such that the defendants should have been on notice."

- "[T]he Tenth Circuit has made clear that every factual novelty need not have been determined in order to show a clearly established right."

- "[T]he totality of the circumstances suggests that the actions shock the conscience."

■ Further, unlike in *Brace,* 919 P.2d at 241, where the supreme court noted "we cannot ascertain if the trial court undertook this analysis and determined that the facts, as alleged, could support a violation of a clearly established constitutional right," here the trial court held that plaintiffs "pled specific factual allegations necessary to sustain a conclusion that the defendants violated clearly established law." Therefore, we conclude that interlocutory review is proper but limited to the trial court's legal conclusions, taking plaintiffs' factual allegations as true.

### III. Violation of Clearly Established Constitutional Rights

Defendants contend that because their conduct did not constitute a violation of a clearly established constitutional right, the trial court erred in denying them qualified immunity. We agree with the trial court.

■ For a right to be clearly established, precedent must be "sufficiently clear that a reasonable official would have understood that his conduct violated the right," based on a Supreme Court decision, a Tenth Circuit decision, or the weight of other federal court authority. *Currier v. Doran,* 242 F.3d 905, 923 (10th Cir.2001). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition...." *Novitsky v. City of Aurora,* 491 F.3d 1244, 1255 (10th Cir.2007). A focused inquiry is necessary because "the unlawfulness of the action must be apparent in light of the pre-existing law." *Id.* at 1256.

■ However, "the precise action or omission in question need not previously have been held unlawful," and "the facts need not precisely mirror the facts of the precedent setting case." *Yvonne L. v. New Mexico Dep't of Human Services,* 959 F.2d 883, 891–92 (10th Cir.1992) (accepting right as established based on decisions in three other circuits); *see also Currier,* 242 F.3d at 923 (plaintiff seeking to show clearly established law need not cite a case with "exact corresponding factual circumstances"). Especially where the analysis requires "careful attention to the facts and circumstances of each particular case," a court "cannot find qualified immunity wherever [it sees] a new fact pattern." *Casey v. City of Federal Heights,* 509 F.3d 1278, 1284 (10th Cir.2007) (internal quotation marks and citations omitted).

### A. Established Law on the Substantive Due Process Rights of Children in Foster Care

■ The Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). *DeShaney* rejected the minor plain-

tiff's claim that state officials had violated his constitutional rights "by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." *Id.* at 193, 109 S.Ct. 998. However, the court noted:

> Had the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held ... that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents.

*Id.* at 201 n. 9, 109 S.Ct. 998 n. 9.

Consistent with this caveat, the Tenth Circuit has recognized two exceptions. First, if "the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others." *Armijo v. Wagon Mound Public Schools,* 159 F.3d 1253, 1261 (10th Cir.1998). Second, even without a special relationship, "state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." *Seamons v. Snow,* 84 F.3d 1226, 1236 (10th Cir. 1996). For liability to attach under either exception, the state actor's conduct must "shock the conscience." *Radecki v. Barela,* 146 F.3d 1227, 1230 (10th Cir.1998).

As of 2003, the Tenth Circuit had applied these exceptions to state social service officials as follows.

### 1. Special Relationship

In *Yvonne L.,* 959 F.2d at 892, the Tenth Circuit held that children in the state's legal custody have a clearly established "constitutional right to be reasonably safe from harm; and that if the persons responsible place children in a foster home or institution that they know *or suspect* to be dangerous to the children they incur liability if the harm occurs." *Id.* at 893 (emphasis added). There,

the plaintiffs alleged that social service officials placed them in a foster home which was unsafe due to inadequate staffing and supervision, and then failed to screen and isolate other children who posed a threat.

The court relied on three cases from other circuits where qualified immunity had been denied: *Doe v. New York City Dep't of Social Servs.,* 649 F.2d 134 (2d Cir.1981) (foster child alleged that with knowledge of possible sexual abuse from foster father, state officials failed to investigate or remove her from foster home); *Taylor v. Ledbetter,* 818 F.2d 791 (11th Cir.1987) (child's guardian alleged that state officials failed to thoroughly investigate fitness of foster home; knew or should have known foster parents were unfit; failed to maintain proper supervision in inspection of the foster home; and failed to obtain complete physical and medical records, or to furnish available records to foster parents); *K.H. v. Morgan,* 914 F.2d 846 (7th Cir.1990) (plaintiff alleged state officials placed her in foster homes that they knew to be either abusive or unable to care for her properly).

The court explained that children in the state's custody are "entitled to more considerate treatment and conditions than [are] criminals" under the Eight Amendment's deliberate indifference standard. *Yvonne L.,* 959 F.2d at 894. Thus, it held that the standard of conduct for liability in the foster care setting is "failure to exercise professional judgment." *Id.*

The "[f]ailure to exercise professional judgment ... does not require actual knowledge the child [ ] will be harmed," but rather "implies abdication of the duty to act professionally...." *Id.* In that event, "[i]f defendants knew of the asserted danger to plaintiff[ ] or failed to exercise professional judgment thereto, ... and if an affirmative link to the injuries plaintiff[ ] suffered can be shown, then ... defendants violated plaintiff['s] constitutional rights." *Id.* at 890.

### 2. Danger Creation Theory

In *Currier,* 242 F.3d at 923, the Tenth Circuit held that even without a special relationship, "a state could be liable when it

affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence." Under this theory, a plaintiff must show that (1) the charged state entity and the charged individual actors created the danger or increased the plaintiff's vulnerability to the danger in some way; (2) the plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking. *Id.* at 918. A state official's conduct "should typically ... impose[ ] an immediate threat of harm, which by its nature has a limited range and duration." *Ruiz v. McDonnell,* 299 F.3d 1173, 1183 (10th Cir.2002).

In *Currier,* the estate of a three-year-old child whose father had killed him brought a section 1983 action against social workers who removed the child from the mother's custody and allowed the father to regain custody. The court concluded, as relevant here, that one of the social workers had "created the danger or increased the plaintiff['s] vulnerability to the danger through his failure to investigate the numerous bruises and allegations of abuse and his responsibility for the court order granting legal custody to [the father]," 242 F.3d at 919–20 (internal quotations omitted), but instead "said nothing" to the court of dangers to the children. *Id.* at 909.

### B. Application

Based on this established law, we conclude that defendants' conduct as alleged by plaintiffs violated the constitutional rights of B.N.S., R.T.S. and B.K.S. Therefore, because the trial court found disputed issues of material fact, defendants are not entitled to summary judgment on qualified immunity.

### 1. Plaintiffs' Allegations

The plaintiffs' extensive allegations involve three categories: first, the children "should not have been placed or allowed to remain in the Staley foster home"; second, while in the Shirk home before the adoption, defendants

"failed to disclose ... critical information necessary to parent the children" and provide the children with a safe environment, such as by separating them; and, third, defendants continued to support adoption of the children as a sibling group while failing to inform the Shirks of known risks that the adoption would fail and of ongoing dangers that the children posed to each other. For example:

- Forsmark placed the children "in an obviously dangerous foster home that had an incidence of reports of abuse and neglect as much as 25 times that of the average Adams County foster home."
- Penny Staley, the foster mother, "had been placed on the central registry for child abuse ... and had been reported four additional times for physically abusing foster children...."
- Two of the Staleys' adopted children "were both reported for sexually abusing other children."
- Forsmark "ignor[ed] alarming signs and symptoms of ongoing sexual abuse of [the children] during their two-plus years in the Staley home, and ... fail[ed] to do risk and safety assessments despite many unexplained injuries to the children."
- Defendants failed "to disclose [to the Shirks] ... that there had been eight founded incidents of sexual abuse of their children when they were at the Staleys...."
- "There was no disclosure of other factors, such as severe emotional abuse, sexual abuse, or sexual acting out behaviors by the children, even though these factors were known to Forsmark."
- O'Donnell failed to disclose to the Shirks two reports: one from Jefferson County and one from the Arvada Police on sexual abuse of the children at the Staley foster home. She "admitted that the Shirks needed this material information to keep their children safe."
- The Arvada police report revealed "incestuous behaviors that existed between the children while in the Staley foster home."

- O'Donnell admitted "that she failed to obtain the January police report in a timely manner" and "that this information contained critical information about incest among the Plaintiff children that was essential to keeping the children safe."
- "Defendants placed [the] children in the Shirk[s'] home without providing the Shirks with adequate information concerning the children's medical and mental health history and needs."
- "Concerns about the children's safety as a sibling group should have been assessed and evaluated by O'Donnell six months prior to the eleventh hour disclosures by the children and the adoption that occurred with the Shirks having false, inaccurate and/or materially incomplete information that they needed to ... keep their children safe."
- Defendants failed to disclose a Department memo regarding adoption by the Shirks written by O'Donnell that discussed potential problems with the adoption.
- "The matching documents and home study clearly show that the Shirks indicated that they were not able emotionally to adopt children with the exact characteristics of the ... children. [ ] O'Donnell [and] Lytle had the duty not to allow the adoption to proceed."
- "Instead of helping [the Shirks] understand the enormity of the situation they were confronting with these profoundly abused children, [ ] Lytle pushed for an expedited hearing."
- At the hearing, "[t]he county attorney informed the Shirks that he had spoken to [ ] Lytle ... and despite O'Donnell's representations to the contrary, the adoption would proceed."
- "After the adoption hearing, [Forsmark] told the Shirks that she was 'not surprised' that the children were engaging in mutual sexual activity."
- "[I]mmediately after the adoption was finalized, O'Donnell [called another caseworker] and warned her that B.N.S was dangerous to her siblings and would need to be removed from the home."

### 2. Forsmark's Knowledge of Dangers in the Staley Home

Forsmark concedes that as the children's caseworker, she had a special relationship with them under *Yvonne L.* However, she argues that she was unaware of the dangers in the Staley home and did not fail to exercise professional judgment by placing the children, or allowing them to remain, in the home.

According to plaintiffs, Forsmark "knowingly placed ... B.N.S., B.K.S. and R.T.S. in a dangerous situation when [she] placed the children in the foster home of ... Dan and Penny Staley, and by doing so affirmatively created a substantial, immediate, obvious and known danger to the ... children." Plaintiffs further allege that Forsmark "improperly investigat[ed] ... Dan and Penny Staley; [and] improperly certif[ied]/licens[ed] [them] as foster parents...."

Plaintiffs also allege that Forsmark violated the children's constitutional rights by "failing to remove [them] from the Staley foster home" and failing to "assess or investigate possible sexualized behaviors" exhibited by the children while in that home. Forsmark's response that she did not believe the children's behaviors "were sexually inappropriate or indicative of sexual abuse" is insufficient because plaintiffs allege that:

- Penny Staley "had informed Forsmark about worrisome behavior, including that B.N.S. was unusually interested in having a boyfriend, that the children had no sense of privacy, routinely walked around naked in front of each other, and they constantly left bathroom doors open while bathing, etc."
- "A needs based care assessment done by [the Department], which was in Defendant Forsmark's own file, indicated that B.N.S. and R.T.S were demonstrating inappropriate sexual behavior at their first assessment on August 30, 2000."
- Forsmark admitted that Penny Staley "had told her about B.N.S.'s humping behaviors on more than one occasion."

Taking these allegations as true, we conclude that Forsmark failed to protect the children and keep them reasonably safe from harm. Therefore, under *Yvonne L.* she could be liable for the children's injuries that resulted from such danger. Further, actual knowledge is not required to defeat qualified immunity for failure to exercise professional judgment. *See Yvonne L.*, 959 F.2d at 894.

We reject Forsmark's argument that her placing the children in the Staley home and allowing them to remain there do not meet the "shock the conscience" standard. If Forsmark "was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow," *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir.1995), then making the decision to place the children in the Staley home could be seen as a "conscious and unreasonable disregard of the consequences." *Id.* (discussing the shock the conscious standard). And "such conduct, if true, when viewed in total, possibly could be construed as conscience-shocking, depending on [the] context as determined after a full trial." *Armijo*, 159 F.3d at 1264.

We also reject Forsmark's argument that even if her conduct as alleged violated the children's constitutional rights, the law was not sufficiently established concerning her specific actions. As explained above, the law was clearly established that when state officials "place children in a foster home or institution that they know or suspect to be dangerous to the children they incur liability if the harm occurs." *Yvonne L.*, 959 F.2d at 892. The same is true of failure to remove children from a dangerous foster home. *Doe*, 649 F.2d at 144 ("If the agency had investigated [plaintiff's] case with sufficient acuity and diligence to discover the abuse, it would have been able to prevent further abuse by withdrawing her from the home.") (cited with approval in *Yvonne L.*). We eschew "a scavenger hunt for prior cases with precisely the same facts [in favor of] the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir.2004).

Accordingly, we conclude that Forsmark was not entitled to summary judgment based on qualified immunity.

### 3. O'Donnell's Failure to Investigate and Disclose Information

O'Donnell also concedes that as the children's caseworker, she had a special relationship with them as set forth in *Yvonne L.* However, she argues that she met her professional obligations, and if not, her conduct would not shock the conscience.

Plaintiffs allege that O'Donnell failed to disclose information critical to the children's safety while they were in the Shirk home before the adoption, including an investigation by Jefferson County, a police report by the City of Arvada on sexual abuse in the Staley home, and an adoption memorandum on the children which highlighted potential future problems. According to plaintiffs:

> O'Donnell lacked professional judgment and abdicated her duties as their caseworker when she failed to put an immediate safety plan in place to ensure their protection and safety and when she failed to investigate the extent of the behaviors between the children and procure the therapeutic psychological services that they needed.

Plaintiffs also allege that the children "were a danger to each other and should never have been placed as a sibling group in the Shirk home for adoption." Due to O'Donnell's lack of professional judgment, the children "continued to engage in unsafe behaviors from January 2003 to August 2003."

Both the Jefferson County investigation and the Arvada police report confirmed that the children had been sexually abused while in the Staley home. The police report also had information about B.N.S. and R.T.S. engaging in incestuous behavior at the Staley home. The adoption memorandum, which was prepared by O'Donnell and sent to Lytle, provided in relevant part: "The future prognosis for R.T.S. and B.N.S. to act out sexually could destabilize this family with the demands of resolving the recent sexual abuse by a foster brother." Plaintiffs allege that O'Donnell did not provide any of this information to the Shirks.

As explained in *Yvonne L.*, 959 F.2d at 890, the failure to exercise professional judgment "does not require actual knowledge the child [ ] will be harmed." Hence, failure to obtain the police report could be seen as an abdication of O'Donnell's duty to act professionally. Based on that failure, the Shirks were not notified of the safety measures that could have been implemented in their home to protect the children from each other. And, as a result, but unknown to the Shirks, "the children continued to engage in unsafe behaviors" at the Shirks' house while O'Donnell was the caseworker.

We reject O'Donnell's argument that such conduct was not conscience shocking. We discern no principled distinction, nor does O'Donnell suggest one, between failing to protect a child from abuse by a party not under control of a social services department and, as here, failing to protect profoundly disturbed children from each other. Therefore, failing to protect the children from incestuous behavior, of which a state official knew or suspected, such as by removing B.N.S. from the Shirk home, could be found to shock the conscience. *See Armijo*, 159 F.3d at 1264.

We also reject O'Donnell's argument that the law was not clearly established as to her specific conduct. *Taylor*, 818 F.2d at 793 (cited with approval in *Yvonne L.*), denied qualified immunity where the plaintiffs alleged in part that state officials had "failed to ... furnish available records to the foster parents." *See Pierce*, 359 F.3d at 1298–99 ("even in novel factual circumstances" the law need only give "fair warning" of unconstitutional action).

Accordingly, we conclude that O'Donnell is not entitled to summary judgment based on qualified immunity.

### 4. Lytle's Role in the Adoption

Plaintiffs' main allegations against Lytle are that despite the concerns expressed in the adoption memo to Lytle, the children's revelations of incest against each other on the eve of the adoption, and O'Donnell's urging that the adoption be postponed, Lytle continued to support the children being adopted as a sibling group; continued to support adoption by the Shirks; and failed to inform the Shirks about potential barriers to the adoption, including risks the children posed to each other. For example:

- "[Lytle] placed [the] children in the Shirks' home without providing the Shirks with adequate information concerning the children's medical and mental health history and needs and without preparing the Shirks to deal with the predictable behaviors and treatment needs of the Plaintiff children placed in their home. As a result, the Shirks were unaware of and unequipped to meet Plaintiff children's needs."

- "Plaintiffs B.N.S., R.T.S. and B.K.S. have suffered irreparable physical and emotional harm as a result of the failure to adequately assess their needs and provide therapeutic assistance.... As a result, they require special attention, constant monitoring, modified living quarters, and extraordinary medical and psychological therapies. These needs and resulting expenses are expected to continue indefinitely."

Unlike Forsmark and O'Donnell, whose conduct involved violations of the children's constitutional rights while in the Department's custody, Lytle's conduct relates primarily to injuries that occurred as a result of their adoption as a sibling group, after the children's special relationship with the Department had ended. Therefore, we analyze whether Lytle violated the children's constitutional rights under the danger creation theory, and we conclude that plaintiffs' allegations support such a violation.

Plaintiffs allege that a pre-adoption evaluation explained they were "prepared to parent a child with mild, to perhaps moderate, difficulties in some areas," but they were "not prepared to parent a child with significant behavioral, emotional or academic delays." The Shirks also noted on their "type of child" form that they could not handle a child with, among other things, "a history of incestuous relationship." Based on this information, Lytle "had a duty not to have allowed the adoption to proceed."

Plaintiffs further allege that Lytle knew, based on the memo prepared by O'Donnell, that adoption of the children "was at high risk for disruption." That memo discussed how a previous family who had sought to adopt the children "found the psychiatric needs of the two older children to be too challenging for their emotional resources." And it stated that "B.N.S. and R.T.S. had minimal progress in treatment and additional hospitalizations may occur." Plaintiffs allege that Lytle did not inform them of these risks, but instead continued to push the adoption forward.

According to plaintiffs, on the morning of the adoption hearing, O'Donnell told them "that it was her opinion that the adoption should, and would, be postponed for 6–12 months to investigate and stabilize the situation." Nevertheless, Lytle decided that the adoption should proceed.

Plaintiffs also allege that Lytle did not provide them with any information on how to keep the children safe following the adoption, such as "the need for separate bedrooms, alarming the bedroom doors at night, monitoring the children's behavior around each other, other children, and pets, and obtaining individual counseling for each child," nor were the grave risks to the children of finalizing the adoption as a sibling group that day explained to them. As a result, plaintiffs allege that the children continued to engage in incestuous behavior, which they were insufficiently informed to prevent, after the adoption.

We conclude that the conduct alleged by plaintiffs is sufficient to show Lytle violated the children's constitutional rights. Lytle increased the children's vulnerability to the danger by not preparing the Shirks to deal with their extraordinary emotional needs, and by continuing to support the children's adoption as a sibling group, despite the revelations of incest, which distinguished them from the type of children the Shirks had indicated they were ready to adopt. This conduct put the children at substantial risk of serious, immediate, and proximate harm that was known to or suspected by Lytle at the time of the adoption. Such allegations show that Lytle acted recklessly in conscious disre-

gard of that risk. And such conduct, when viewed in total, is conscience shocking.

We also conclude that the law was clearly established and Lytle would have known, based on *Currier*, "that reckless, conscience shocking conduct that . . . placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional." 242 F.3d at 924. There, the court observed that the social worker, "either through his failure to investigate and report to the Children's Court or his affirmative recommendation to the Children's Court, was responsible for [the placement] decision." *Id.* at 909. Again, we discern no principled distinction between the social worker in *Currier* who "said nothing" to the court, 242 F.3d at 909, and Lytle's alleged actions.

In so concluding, despite the absence of authority dealing with danger creation in approving an adoption, we consider that "[t]he degree of specificity required from prior case law depends in part on the character of the alleged conduct. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required." *Pierce*, 359 F.3d at 1298. Viewing the allegations against Lytle in total, they describe egregious conduct.

We are not persuaded otherwise by Lytle's argument that she "did not act alone in allowing the adoption to go forward." Plaintiffs' allegations describe Lytle's role in moving the adoption forward, despite the contrary information in her possession. That others may have been involved in approving the adoption does not diminish Lytle's singular role in overruling O'Donnell that it should be delayed.

Nor are we persuaded that because incestuous behavior among the children had already occurred in the Shirk home, "There is no constitutional violation for allowing the status quo to continue." This argument equates a foster-adopt placement to a consummated adoption, without citation of authority. These circumstances differ, both practically and legally. *See* § 19–5–211, C.R.S.2011. After the adoption, the children were no longer in the Department's custody. Thus, decisions concerning their care would

be made by the Shirks, without ongoing supervision by the Department.

Further, Lytle did more than merely preserve the status quo in the Shirk home. When she overruled O'Donnell, "the children were in emotional chaos" and the Shirks "thought B.N.S. might be suicidal." These developments changed the status quo and showed the increased risk of making sibling placement permanent by pushing to conclude the adoption.

Accordingly, we conclude that Lytle is not entitled to summary judgment based on qualified immunity.

The orders denying summary judgment are affirmed.

Judge ROY and Judge FOX concur.