2012 COA 70M

**Patricia DAVIS, Plaintiff–Appellee,**

v.

**GUIDEONE MUTUAL INSURANCE COMPANY, Defendant–Appellant.**

**Nos. 10CA1625, 10CA2514.**

Colorado Court of Appeals, Div. I.

April 26, 2012.

As Modified on Denial of Rehearing July 19, 2012.

Lloyd C. Kordick & Associates, Lloyd C. Kordick, Colorado Springs, Colorado; J. Stephen Price, Colorado Springs, Colorado, for Plaintiff–Appellee.

John R. Rodman & Associates, John R. Rodman, Caleb Meyer, Brendan P. Rodman, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge DAILEY.

¶ 1 In these consolidated appeals, GuideOne Mutual Insurance Company (GuideOne), appeals the trial court's judgment and award of attorney fees in favor of plaintiff, Patricia Davis. We affirm in part, vacate in part, and remand with directions.

¶ 2 On appeal, the primary issue is whether, under the former Colorado Auto Accident Reparations Act (CAARA),[1] GuideOne had to disclose various personal injury protection (PIP) benefit options to Davis when she became the named insured on an automobile policy which had originally been issued to her ex-husband. We conclude that GuideOne had such an obligation.

### I. Background

¶ 3 In 1995, GuideOne (doing business as Preferred Risk) issued an automobile insurance policy covering Davis's husband as the "named insured" and Davis as a "resident spouse."

¶ 4 At the time, CAARA required all drivers to carry insurance which, in the event of an accident, would pay "basic" PIP benefits to insureds, resident relatives, vehicle passengers, and pedestrians injured by the covered vehicle, regardless of blame. *See* §§ 10–4–706(1)(b), (c), 10–4–707(1).[2] Insur-

ers were also required to offer insureds the opportunity to purchase, at increased premiums, enhanced PIP benefits. *See* § 10–4–710(2)(a).[3]

¶ 5 Because high insurance premiums were associated with "no-fault" coverage, insurance companies were allowed, in connection with basic PIP benefits, to offer insureds various "managed care" options, including a preferred provider organization (PPO) option, which, in exchange for a reduced premium, required insureds, in the event of an accident, to use certain preapproved medical providers. *See* § 10–4–706(2).

¶ 6 When Davis's husband applied for the policy, he opted for PPO-restricted "basic" PIP coverage, and, as required by law, executed a disclosure form with that option. In January 1999, the husband requested that GuideOne make Davis the named insured on the policy because he and Davis had divorced and no longer lived together. GuideOne did so, sending Davis documents informing her of the terms of coverage under the policy but not alerting her to any PIP option beyond the PPO-restricted one contained in the policy.

¶ 7 In August 2000, Davis was injured in a car accident. Initially, she was treated for her injuries under GuideOne's PPO program. In early 2002, however, GuideOne received a request for authorization of treatment from a non-PPO chiropractor. GuideOne refused the request until an independent medical exam (IME) could be conducted by a PPO doctor to assess whether the treatment sought was reasonable and necessary care related to the car accident. Before the IME was completed, GuideOne received several additional bills from other non-PPO doctors related to Davis's treatment.

¶ 8 GuideOne withheld payment on the non-PPO bills pending completion of the IME. Upon receiving the IME results, GuideOne paid the bills it had previously re-

---

1. *See* Ch. 94, sec. 1, §§ 13–25–1 to –23, 1973 Colo. Sess. Laws 334–45 (formerly codified as amended at §§ 10–4–701 to –726; repealed effective July 1, 2003, Ch. 189, sec. 1, § 10–4–726, 2002 Colo. Sess. Laws 649).

2. Basic PIP benefits encompassed $50,000 for medical services, $50,000 for rehabilitation ser-

vices, and fifty-two weeks of wage loss reimbursements. § 10–4–706(1)(b)–(d).

3. Enhanced PIP benefits could cover costs of medical services and wage losses in either an unlimited amount or, at the option of the insurer, up to a total of $200,000. § 10–4–710(2).

ceived but stopped paying for any further non-PPO chiropractic care for Davis.

¶ 9 In late 2003, Davis filed the present action against GuideOne. In her amended complaint, she alleged that GuideOne violated CAARA, breached its contract with her, engaged in bad faith insurance practices, and owed her additional PIP benefits.

¶ 10 The trial court granted two of Davis's motions for partial summary judgment, determining that (1) GuideOne was statutorily required to advise her of various PIP options when she became the named insured on the policy, and it had not done so; and, consequently, (2) PIP benefits would not be restricted to the "basic" PPO coverage in the policy but would be unlimited in amount, effective as of the day she became the named insured on the policy.

¶ 11 In contrast, the trial court denied two of GuideOne's motions for partial summary judgment on Davis's claims of bad faith and for treble damages. The court ruled that, even if GuideOne's actions were based entirely on its statutory interpretation, the reasonableness, or conversely, the willful and wanton nature, of its conduct had to be determined as a question of fact at trial, rather than as a question of law.

¶ 12 Without any further objection from GuideOne, at trial the parties presented conflicting expert testimony about whether GuideOne acted, at best, reasonably, and, at worst, willfully and wantonly, in treating Davis's policy as providing benefits only under the PPO program; answering falsely a request for admission; destroying the original policy; certifying two different copies of the policy; sending a check late to her for the amounts due; including, on the check, language that her endorsement would release GuideOne from future liability; and refusing to pay statutorily required interest on past due payments.

¶ 13 At the close of evidence, the trial court granted, over GuideOne's objection, an amendment to Davis's complaint to allow the jury to consider a claim for punitive damages. Ultimately, the jury found:

● GuideOne had violated CAARA in bad faith by willfully and wantonly (1) failing to pay Davis's medical bills covered under her policy; (2) delaying payment of over $36,000 in medical bills; (3) belatedly paying over $15,000 in lost wages; and (4) failing to timely pay interest on the late medical bills; and

● GuideOne had breached its insurance contract in bad faith by (1) unreasonably delaying or denying payment (or approval) of Davis's medical treatment; and (2) knowingly—or recklessly—disregarding that its conduct was unreasonable.

¶ 14 The jury awarded Davis $500,000 in noneconomic damages; $905,000 for economic damages; $500,000 for physical impairment; and $1 million in punitive damages. However, because the jury also found that Davis was ten percent responsible for her injuries, the trial court reduced the jury awards for noneconomic, economic, and physical impairment damages by ten percent. After trebling the delayed medical and wage loss payments, calculating interest, and adding in the punitive damages award, the trial court entered judgment for Davis for $5,001,001.14 and subsequently awarded her $344,680.25 in attorney fees.

¶ 15 On appeal, GuideOne contends the court erred in (1) granting Davis's motions for partial summary judgment; (2) denying its motions for partial summary judgment, or, in the alternative, allowing the jury to decide, as a question of fact, the issue of whether it had engaged in bad faith practices; (3) allowing the jury to consider Davis's belated claim for punitive damages, and (4) awarding attorney fees to Davis under CAARA.

¶ 16 We address, in turn, each of GuideOne's contentions.

*II. Partial Summary Judgment for Davis*

¶ 17 GuideOne contends that the trial court erred in granting summary judgment for Davis on her claims that (1) GuideOne violated CAARA by not disclosing to her the managed care PIP options when she became the named insured under the policy and (2) she was entitled to have her policy reformed, as of the date she became the named insured, to provide for unlimited PIP benefits. We disagree with GuideOne's first assertion and with part of its second.

¶ 18 We review de novo the trial court's summary judgment ruling. *Montoya v. Connolly's Towing, Inc.*, 216 P.3d 98, 103 (Colo.App.2008). Summary judgment is appropriate only if the pleadings, affidavits, depositions, or admissions in the record establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *see also Nelson v. Gas Research Inst.*, 121 P.3d 340, 343 (Colo.App. 2005).

## A. GuideOne's Obligation to Disclose Managed Care PIP Options

¶ 19 Here, the parties agree that there is no genuine issue of material fact which could affect the determination of the issue. They assert, and we agree, that this determination depends solely on the interpretation of statutory provisions, a matter which presents a question of law subject to de novo review by this court. *See Vigil v. Franklin*, 103 P.3d 322, 327 (Colo.2004).

¶ 20 Under former section 10–4–706(2)(a)(I), insurers were allowed to offer, "at the option of the named insured, the [basic PIP] benefits ... through managed care arrangements such as a health maintenance organization (HMO) or a preferred provider organization."

¶ 21 If an insurer offered a managed care arrangement, it was required, "upon an initial application for insurance coverage," to disclose certain information, such as "[w]hat managed care is and how it affects the consumer," § 10–4–706(2)(a)(II)(B); the "potential cost savings" associated with managed care, § 10–4–706(2)(a)(II)(C); and that "a policy containing a managed care option may be accepted or rejected by the named insured at any time upon notice to the insurer or its agent," § 10–4–706(2)(f)(I). It was also required to certify to the commissioner of insurance these disclosure forms to record an insured's election of such coverage. § 10–4–706(2)(f).[4]

¶ 22 According to GuideOne: (1) the disclosures had to be made only once, and a disclo-sure form executed by an insured, that is, when the original named insured on the policy (i.e., the ex-husband) applied for insurance; (2) the required disclosures were made, and the ex-husband executed the disclosure form; (3) Davis, as a resident spouse under the original policy, was on notice of the PPO selection as well as the policy provision that the PPO selection would apply to any policies that replaced or superseded the original, unless the insured requested a change; and (4) because Davis never made such a request, she was bound by the PPO selection. We are not persuaded.

¶ 23 When construing a statute, a court must ascertain and give effect to the intent of the General Assembly and refrain from rendering a judgment that is inconsistent with that intent. *Trappers Lake Lodge & Resort, LLC v. Colorado Dep't of Revenue*, 179 P.3d 198, 199 (Colo.App.2007). To determine legislative intent, we look first to the words of the statute. *Id.* If those words are clear and unambiguous in import, we apply the statute as written. *Id.* If, however, the words are ambiguous or unclear, such that "the words chosen do not inexorably lead to a single result," we may consider, among other things, the legislative declaration, the object sought to be attained, and the consequences of a particular construction. *Id.* at 199–200 (quoting *State v. Nieto*, 993 P.2d 493, 501 (Colo.2000)). Ultimately, a statute must be construed to further the legislative intent represented by the entire statutory scheme. *Trappers*, 179 P.3d at 200.

¶ 24 The words of the above-mentioned CAARA provisions clearly show the legislature's intent to require an insurer to disclose PIP options—such as a PPO plan—and allow the named insured on the policy to accept or reject such an option.

¶ 25 It is undisputed in this case that GuideOne complied with this requirement when Davis's ex-husband initially applied for coverage and executed, as the named insured on the policy, a PPO disclosure. It is also undisputed that, under former section 10–4–

4. Under Division of Insurance regulations, promulgated under the authority of the commissioner of insurance, *see* § 10–4–706(2)(g), "The insurer [is] responsible to maintain the executed disclosure forms as proof that the selection of the insured of a cost containment option was on a voluntary basis and not a condition of providing insurance coverage." 3 Code Colo. Regs. 702–5.

706(2)(d)(I), while Davis was listed as a "resident spouse" on that policy, she was subject to the PPO limitation therein. *See* § 10-4-706(2)(d)(I) ("The optional coverage ... shall apply only to the named insured, resident spouse, resident relative, and any person operating the described motor vehicle with the permission of the named insured or resident spouse."); 3 Code Colo. Regs. 702–5(8) ("The selection of a cost containment option and the signature on the disclosure form by one named insured, if there is more than one person named as insured, is binding upon all named insureds, a resident spouse, resident relatives and any permissive user of the insured automobile.").

¶ 26 What remains at issue, however, is whether, when the ex-husband was removed from—and Davis added to—the policy as a named insured, GuideOne was required to treat her as if she were making an initial application for insurance. We conclude that it was so required.

¶ 27 The CAARA provisions do not expressly address this issue. We find instructive, however, the analysis of the Hawaii Supreme Court in *Allstate Insurance Co. v. Kaneshiro*, 93 Hawai'i 210, 998 P.2d 490 (2000). In that case, the pertinent statute (1) required insurers to offer their insureds the opportunity to purchase uninsured motorist (UM) and underinsured motorist (UIM) coverage when a policy was first applied for or issued; and (2) stated that an insurer was not required to offer UM/UIM coverage again when a renewal or replacement policy was issued. As in the present case, a woman's ex-husband was the named insured on a policy that listed her as an additional driver; the insurer offered—and the ex-husband rejected—optional (there, UM/UIM) coverage; the ex-husband, in light of the couple's divorce, requested that he be removed from the policy and that his ex-wife be identified as the named insured; and the insurer did not offer UM/UIM coverage to the wife when she was substituted as the named insured.

¶ 28 The ex-wife in *Kaneshiro*, on the one hand, argued that the policy issued to her was a new policy that required the insurer to offer her the opportunity to purchase or reject UM/UIM coverage. The insurer, on the other hand, argued that the policy was merely a renewal or replacement of the policy originally issued to the ex-husband, and thus it had no duty to offer UM/UIM coverage again.

¶ 29 The Hawaii Supreme Court held that the insurer was obliged to offer UM/UIM coverage to the wife because her substitution for her ex-husband as the named insured on the policy significantly impacted the legal relationship between her and the insurance company:

> At the time of [the ex-husband's] ... written rejection, [the wife] was covered under the policy as a listed driver of the insured vehicle and as [the] resident spouse. As the then-sole named insured, the coverage was personal to [the ex-husband], and he made the decisions regarding coverage. However, ... when (1) [the ex-husband] was deleted from the policy, (2) [the wife] was substituted as the sole named insured, and (3) [the insurer] received notice that [she] was no longer [a] resident spouse because of the[ ] pending divorce, the coverage became personal to [*the wife*], and *her* risk of loss was insured.

998 P.2d at 500 (footnote omitted).

¶ 30 Based on this reasoning, the court determined that the substitution of the insured's name for the husband's on the policy constituted a "material change" (i.e., not merely a renewal or replacement of the policy) requiring the insurer to make a new offer of UM/UIM coverage to the insured. *Id.* at 501. The court noted that making a new offer of coverage would not have entailed a significant burden on the insurer. *Id.* at 500.

¶ 31 We recognize that, in *Allstate Insurance Co. v. Parfrey*, 830 P.2d 905, 913 (Colo. 1992), our supreme court declined to interpret Colorado's UM/UIM statute as requiring an insurer to re-offer such coverage upon a "material change" to the policy. In reaching this conclusion, the supreme court stated that there was "nothing in the statutory text suggesting a legislative intent to incorporate the 'material change' standard" as a basis for re-offering UM/UIM coverage. *Id.*

¶ 32 However, the "material changes" with which the *Parfrey* court was concerned involved increasing liability coverage and adding a new vehicle to the policy—neither of

which was important under the UM/UIM statute. Here, however, the change in the policy—namely, the identity of the named insured—figures prominently in CAARA statutes regarding PIP benefit disclosures. Indeed, the statutory disclosure requirement to allow the named insured to make a choice about managed care coverage suggests that the legislature intended that any named insured—whether or not substituted for another—be allowed to make that same choice.

¶ 33 In the present context, we find persuasive the underlying reasoning (though not necessarily the ultimate terminology used) in the *Kaneshiro* case: the substitution of Davis for her ex-husband as the named insured on the policy created a new insurance policy requiring new disclosures about managed care PIP options. To allow GuideOne to bind Davis to a PPO selection made by her ex-husband—who, importantly, was no longer even a party to the insurance contract—would, in our view, be contrary to the legislative intent, expressed in former section 10-4-706(2)(e), of arriving at "a voluntary agreement between the insured and the insurer" regarding managed care PIP options.

¶ 34 In reaching this conclusion, we reject GuideOne's assertion that, because Davis had not applied for insurance, it was not required to make any disclosures to her. The ex-husband's request to change the named insured on the policy was in effect an "initial" application for insurance coverage on her behalf.[5] As noted by the trial court, when GuideOne changed the sole named insured to Davis, "it was the same as accepting an application for a new policy of auto insurance and required the same full statutory advisement." Further, having acted favorably on the ex-husband's request, GuideOne should not be permitted to now argue otherwise.

¶ 35 For these reasons, we conclude that, when Davis became the named insured on the policy, GuideOne was obligated to disclose to her the managed care PIP options it would have disclosed had she completed a formal application for insurance coverage.

¶ 36 Our conclusion is not undermined in any way by GuideOne's argument that it was

not required to make any disclosures because Davis had constructive notice of, and thus was bound by, the PPO option selected by her ex-husband.

¶ 37 GuideOne correctly points out that an insured is charged with knowledge of a policy's terms. *Unigard Sec. Ins. Co. v. Mission Ins. Co. Trust*, 12 P.3d 296, 300 (Colo.App. 2000). However, GuideOne provides no authority, nor are we aware of any, extending the constructive knowledge of the terms of a policy to the disclosure of options that could have resulted in different terms in a policy. That Davis can be held to have constructive notice of the policy's PPO coverage says nothing about her knowledge of a right to reject it in favor of other coverage.

¶ 38 Thus, we agree with the trial court's conclusion that any duty of Davis, while insured as a resident spouse under the policy, to be informed of the contents of the policy, did "not relieve GuideOne of its statutorily prescribed duties to provide a full disclosure to [her as] the 'named insured' and obtain an informed election from [her regarding] the standard PIP coverage."

¶ 39 Accordingly, we conclude that the trial court properly granted summary judgment in favor of Davis on these issues.

### B. Reformation of the Policy

¶ 40 GuideOne contends that the trial court erred in reforming Davis's policy (1) to provide unlimited PIP benefits (2) effective as of the day she became the named insured. We agree with its first, but not its second, assertion.

¶ 41 Apart from the managed care options discussed in section II.A, CAARA required an insurer to offer, "at the option of the named insured," enhanced—instead of basic—PIP benefits. § 10-4-710(2)(a). Unlike the managed care option, however, there was no required manner in which the offer of enhanced PIP benefits was to be communicated to the insured, as long as the insured was offered the opportunity to purchase the requisite types of enhanced PIP coverages.

---

5.  Indeed, according to the deposition testimony of a GuideOne policy service specialist, the named insured on a policy could be changed through either a new application or a change request form, at the option of an insurance agent.

*See Jewett v. Am. Standard Ins. Co.,* 178 P.3d 1235, 1238 (Colo.App.2007).

¶ 42 In the trial court, Davis argued that it was undisputed that, in addition to not receiving a PPO disclosure, she did not receive the statutorily required advisement regarding enhanced PIP benefits when she became the named insured on the policy. Consequently, she argued, she was entitled to a reformed policy that included coverage for such benefits, unlimited as to time and amount.

¶ 43 In response, GuideOne argued, similarly to the argument noted above, that (1) it made an appropriate advisement upon the ex-husband's initial application and his refusal of enhanced benefits remained in effect after Davis became the named insured and (2) Davis was charged with the knowledge that, prior to becoming the named insured, she had standard PIP coverage. GuideOne also argued that, even if the advisement was insufficient, its "supplemental forms clearly indicated any PIP benefits were subject to the $200,000 aggregate limit."

¶ 44 In reply, Davis argued that when an insurer fails to offer enhanced coverage, reformation automatically requires that the insured receive PIP coverage without time or dollar limitation.

¶ 45 In a written order, the trial court concluded that Davis's motion for enhanced benefits was governed by the same analytical approach taken on the PPO issue. It reiterated that, because no disclosure was made to Davis at the time she became the named insured, she was not given the statutorily required opportunity to obtain enhanced PIP coverage. The court held that enhanced PIP benefits without dollar or time limitation would be automatically incorporated into the policy.

¶ 46 On appeal, GuideOne argues that the court's determinations that Davis was entitled to unlimited PIP benefits, effective as of the date she became the named insured on the policy, were erroneous.

### 1. Unlimited PIP Benefits

¶ 47 Under former section 10–4–710(2)(a), insurers were required to offer, in addition to the minimum statutorily required PIP coverage, optional supplemental coverage in exchange for a higher premium. However, under former section 10–4–710(2)(b), an insurer could include, in a complying policy, a $200,000 limit on the total aggregate benefits payable under the enhanced coverage.

¶ 48 When an insurer failed to offer the statutorily mandated optional coverage, such coverage was deemed incorporated into the policy by operation of law, and the policy was to be reformed to so reflect. *Snipes v. Am. Family Mut. Ins. Co.,* 134 P.3d 556, 558 (Colo.App.2006). Whether the enhanced benefits available under the reformed policy would be capped at $200,000, as permitted by former section 10–4–710(2)(b), depended on whether the policy itself so provided. *See id.* (coverage was capped at $200,000 where limit was unambiguously set forth in the policy); *cf. Warren v. Liberty Mut. Fire Ins. Co.,* 555 F.3d 1141, 1148 (10th Cir.2009) ("If the original policy did not include an aggregate cap, the reformed policy will likewise not be capped.").

¶ 49 On appeal, GuideOne does not dispute that, in the event it was required to obtain a PPO election from Davis, it was also required to—but did not—offer her the option of selecting enhanced PIP coverage. However, GuideOne maintains that its failure to make such an offer did not entitle Davis to unlimited PIP benefits because the ex-husband's original policy contained the $200,000 aggregate cap.[6] We agree.

¶ 50 Unlike PPO or enhanced benefit coverage, an insured was not, under CAARA, entitled to opt into—or out of—the $200,000 benefit cap. Rather, the decision to limit enhanced benefits to a total amount of $200,000 was at the option of the *insurer.* Thus, in contrast to his election of a PPO and refusal of enhanced benefits, it was not the ex-husband's choice to impose a cap, and Davis, by taking his place as a named in-

**6.** In a deposition, the insurance agent who sold the ex-husband the original policy confirmed that it had imposed the $200,000 limit on enhanced benefits. Davis quoted this part of the deposition in her reply to the motion for partial summary judgment on this issue.

sured, was not deprived of a choice with regard to limited enhanced benefits. For these reasons, we conclude that GuideOne could bind Davis to limitations contained in the policy originally executed by her ex-husband when she became the named insured on—and he was removed from—the policy.

¶ 51 In so concluding, we necessarily reject Davis's assertion that the policy had to be reformed to encompass unlimited PIP benefits because of an ambiguity [7] created by GuideOne's action, after she became the named insured on the policy, in (1) not providing her with a full copy of the policy, and (2) sending her two inconsistent certified versions of the PIP part of her policy, one containing the $200,000 cap on benefits, the other not. In the trial court, Davis did not dispute that (1) her policy was, for coverage purposes, the same as that obtained by her ex-husband, and (2) the ex-husband's policy contained the $200,000 benefits cap, which we have determined would be binding on Davis.

¶ 52 Accordingly, the trial court erred in reforming the policy without any limitation as to the amount of payable benefits.

¶ 53 That portion of the trial court's judgment is vacated, and on remand the trial court shall reform the policy to provide Davis with a $200,000 limit on available PIP benefits.[8]

## 2. Date of Reformation

¶ 54 We reject, however, GuideOne's argument that the trial court erred in making the effective date of reformation the day Davis became the named insured on the policy.

¶ 55 In the trial court, GuideOne argued that the court should reform the policy as of the day on which it entered summary judgment for Davis on the PPO issue and determined that the policy should be reformed.

In GuideOne's view, that date was appropriate because whether an event other than an initial application could trigger an insurer's duty to disclose a PPO option was a question of first impression, and thus, its interpretation of the applicable CAARA statutes as only requiring a PPO disclosure upon the exhusband's initial application was reasonable.

¶ 56 The trial court disagreed, finding that (1) GuideOne could reasonably anticipate that a failure to make the statutorily mandated disclosure would result in reformation; and (2) no injustice would result to GuideOne if the effective date of reformation was the date the policy was issued to Davis.

¶ 57 Reformation is an equitable remedy within the trial court's discretion. *Brennan v. Farmers Alliance Mut. Ins. Co.*, 961 P.2d 550, 556 (Colo.App.1998). Thus, we will not disturb the court's reformation date unless its ruling was an abuse of discretion, that is, it was manifestly arbitrary, unreasonable, or unfair. *See E–470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230 (Colo. App.2006).

¶ 58 We perceive no abuse of discretion here. Central to a court's consideration of a reformation date is whether any previous, controlling ruling should have guided the parties in their practices related to the policy at issue. *Breaux v. Am. Family Mut. Ins. Co.*, 554 F.3d 854, 866 (10th Cir.2009). Here, there was authority which would have notified GuideOne of the consequences of failing to make statutorily required disclosure of the availability of enhanced PIP benefits. *See, e.g., Thompson v. Budget Rent–A–Car Sys., Inc.*, 940 P.2d 987, 990 (Colo.App.1996) (where the defendant did not offer enhanced PIP benefits as required by CAARA, policy was reformed to include such benefits). Ac-

---

7. Ambiguities in the meaning of an insurance policy must be construed against the insurance company and in favor of the insured. *Hyden v. Farmers Ins. Exch.*, 20 P.3d 1222, 1224 (Colo. App.2000). Courts must not, however, "force an ambiguity in order to resolve it against an insurer." *City of Arvada v. Colo. Intergovernmental Risk Sharing Agency*, 988 P.2d 184, 186 (Colo. App.1999), *aff'd*, 19 P.3d 10 (Colo.2001).

8. In her brief, Davis asserts that limiting PIP benefits to $200,000 has no practical effect on the judgment entered in this case because liability for benefits over $200,000 had, as of that point, not yet been incurred. When given the opportunity at oral argument, GuideOne did not disagree with that assessment. Rather, it took the position that a $200,000 cap would have a prospective effect only, that is, GuideOne would not have to pay PIP benefits beyond that limit for ongoing claims arising from this accident.

cordingly, the trial court did not abuse its discretion in reforming the policy to provide for enhanced PIP benefits as of the day Davis became the named insured.

### III. Denial of GuideOne's Motions for Partial Summary Judgment, or, in the Alternative, Allowing the Jury to Determine Whether GuideOne Acted in Bad Faith

¶ 59 GuideOne contends that the trial court erred in denying two of its motions for summary judgment, or, in the alternative, in allowing the jury to determine Davis's bad faith claims as factual matters. According to GuideOne, because its actions were based entirely on an issue of statutory interpretation, the reasonableness, or conversely, the willful and wanton nature, of its conduct had to be determined as a question of law, rather than submitted to the jury as a question of fact. For the following reasons, we do not address the merits of these contentions:

- The denial of GuideOne's motions for summary judgment is not reviewable on appeal. *See Shirk v. Forsmark*, 2012 COA 3, ¶ 6 [272 P.3d 1118]; [9] and
- To review GuideOne's alternative contention would, in essence, be to review the denial of its motions for summary judgment. Because the denial of summary judgment is a nonappealable order, to preserve this issue for appeal, GuideOne was required to raise it in a motion for a directed verdict or judgment notwithstanding the verdict. *See Feiger, Collison & Killmer v. Jones*, 926 P.2d 1244, 1251 (Colo.1996). GuideOne raised the issue in neither manner.

¶ 60 At oral argument, GuideOne asserted that it had properly preserved the issue for review in its motion for new trial. C.R.C.P. 59(d)(6) authorizes a court to grant a new trial because of an "error in law." However, GuideOne has not requested, either in the trial court or here on appeal, a reexamination of the matter as an issue of fact. Rather, GuideOne wanted, and still wants, judgment entered in its favor as a matter of law.

Accordingly, a motion for judgment notwithstanding the verdict, not a motion for new trial, was required to preserve the issue, as presented in the trial court and here on appeal. *See generally* Tracy Bateman Farrell et al., 27A *Federal Procedure* § 62:754 (2010) ("A motion for a new trial and a motion for judgment as a matter of law have wholly distinct functions.... [T]he function of the judgment as a matter of law [is] to order a final judgment for the moving party, but the function of the new trial [is] to order a redetermination of the issues before a new jury ....") (footnotes omitted); *see also Torrejon v. Mobil Oil. Co.*, 876 So.2d 877, 884 (La.Ct.App.2004) ("Granting [a motion for new trial] results simply in a new trial; granting [a motion for judgment notwithstanding the verdict] results in depriving the parties of their right to have a jury decide all disputed issues. As two commentators explain, '[T]he important distinction between a JNOV and a judgment granting a new trial is that a JNOV reverses the jury's award and makes the apparent winner the loser, while a judgment granting a new trial merely erases the jury verdict (or trial court judgment) and puts the parties in the positions they occupied prior to the trial.'") (quoting 1 Frank L. Maraist & Harry T. Lemmon, *Louisiana Civil Law Treatise: Civil Procedure* § 13.4 (1999)).

### IV. Punitive Damages

¶ 61 GuideOne contends that the trial court abused its discretion in allowing Davis to amend her complaint after the close of evidence to include a punitive damages claim under section 13–21–102, C.R.S.2011. We disagree.

¶ 62 In her first amended complaint, Davis reserved the right to ask the court for an order permitting her to recover punitive damages. Four and a half years later, Davis moved to further amend the complaint to add claims that GuideOne had unreasonably denied or delayed payment of her benefits and for punitive damages. Without mentioning

---

9. There are exceptions, inapplicable here, to the general rule prohibiting an appeal from the denial of summary judgment. *See, e.g., Shirk*, ¶ 6 (denial of summary judgment motions based on qualified immunity reviewable on appeal); *Geig-* *er v. Am. Standard Ins. Co.*, 192 P.3d 480, 482 (Colo.App.2008) (denial of a motion for summary judgment is a final, appealable order when it effectively ends litigation in the trial court).

the punitive damages issue, GuideOne opposed Davis's motion, and the trial court denied it as untimely because it was filed close to a scheduled trial date.

¶ 63 Trial was, however, continued for eight months. The trial management order stated that Davis was seeking

[p]unitive and exemplary damages in an amount appropriate to punish and make an example of [GuideOne].... [GuideOne] objects to the listing of this damage since the Court has previously denied [Davis's] motion to amend to allow punitive damages....

¶ 64 After the close of evidence, on the eighth day of trial, Davis requested, and GuideOne objected to, an amendment of her complaint to set forth a claim for punitive damages. GuideOne argued that (1) the trial court had previously denied Davis's attempt to add a punitive damages claim; (2) evidence of willful and wanton conduct had been presented to the jury only with "respect to the statutory entitlements to recover treble damages for late payment of benefits"; and (3) allowing Davis to go forward with a punitive damages claim after the presentation of evidence would be prejudicial because GuideOne could not "present evidence with respect to the punitive aspects of the claim" at that point in time.

¶ 65 The court rejected GuideOne's argument that it had already denied Davis's attempt to add a punitive damages claim, stating that its earlier action had been based not on a consideration of the nature of the claim but rather on timeliness and prejudice grounds which, in light of changed circumstances, no longer existed. The court then found:

[E]xemplary damages ha[ve] effectively been presented to this jury. The governing standard is willful and wanton. It's been addresse[d] at some length in front of the jury. The case has been presented as if it's a punitive damages claim.... If this were a case where we had not been addressing willful and wanton conduct during trial I would rule differently. I am not persuaded that [the] case as presented would have been any different had the exemplary damages claims been properly the subject of a motion to amend. The Court was quite convinced that it would

have granted that motion and candidly I would have even granted that motion despite my timeliness concern because of the nature of the case and the way it's been litigated.

. . . .

I'm just not finding a persuasive argument that there's any prejudice given the nature of this case.

¶ 66 Consequently, the jury was instructed about, and returned a verdict in favor of Davis for $1 million on, the punitive damages claim. In a motion for new trial, GuideOne asserted that the trial court committed prejudicial error in allowing the amendment because:

- the standard for a finding of willful and wanton conduct under CAARA is different from the standard for a finding of willful and wanton conduct for insurance bad faith;

- while GuideOne was able to present evidence to contest the allegations of willful and wanton conduct under CAARA, "other such evidence could have been presented, and was not, to negate the elements necessary for a finding of willful and wanton conduct for the purposes of the bad faith claim"; and

- GuideOne did not present such evidence because it relied on the court's order denying Davis's second amended complaint.

¶ 67 In a written ruling, the trial court denied GuideOne's motion for new trial. It found that (1) from the outset of trial, Davis had asserted that GuideOne had acted willfully and wantonly in ways which were "not confined to any single category of [GuideOne's] conduct[,] but reflected an express attempt by [Davis] to paint [GuideOne's] every action as a willful and wanton abuse of [her]"; and (2) GuideOne was obliged to raise an objection during trial when Davis first presented such "broad" claims of willful and wanton conduct. Because GuideOne had not objected to the presentation of these issues at trial, the court ruled, it had impliedly consented to the claim for punitive damages.

¶ 68 Alternatively, the court found that GuideOne was not "well situated to complain

about prejudice" because GuideOne "made only general assertions that it would have prepared differently and/or presented different evidence" and provided "no further enlightenment regarding prejudice" in its motion for new trial.

¶ 69 We review a trial court's ruling on a motion to amend a complaint for an abuse of discretion. *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, —— (Colo.App. 2011). A court abuses its discretion where its decision rests on a misunderstanding or misapplication of the law, *Genova v. Longs Peak Emergency Physicians, P. C.*, 72 P.3d 454, 458 (Colo.App.2003), or is manifestly arbitrary, unreasonable, or unfair. *E–470 Pub. Highway Auth.*, 140 P.3d at 230.

¶ 70 Pursuant to C.R.C.P. 15(b):

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.... If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him [or her] in maintaining his action or defense upon the merits.

¶ 71 Here, GuideOne argues, and we agree, that it did not impliedly consent to try the punitive damages claim. We recognize that, ordinarily,

[a] party who knowingly acquiesces in the introduction of evidence relating to issues that are beyond the pleadings is in no position to contest a motion to conform [the pleadings to the evidence]. Thus, consent is generally found when evidence is introduced without objection, or when a party opposing the motion to amend actually produced evidence bearing on the new issue or offered arguments directly contesting the issue.

6A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1493, at 26–27, 30 (2010) (footnote omitted).

¶ 72 In this case, GuideOne did not object during trial to the introduction of Davis's evidence regarding "willful and wanton" conduct on its part, and it responded with evidence of its own on that issue. Nonetheless, we cannot characterize GuideOne's inactivity during trial as having "impliedly consented" to the new issue, given that it objected twice before to trial to the consideration of the issue and again when the issue was raised following the close of the evidence. *See Lininger v. Knight*, 123 Colo. 213, 219–20, 226 P.2d 809, 812 (1951) (issue not tried by express or implied consent where party's "counsel by his motions and tendered instructions emphatically objected to a trial of any issue not presented by the pleadings") (quoting *W.T. Grant Co. v. Casady*, 117 Colo. 405, 415, 188 P.2d 881, 885 (1948)); *Webb v. Glenbrook Owners Ass'n*, 298 S.W.3d 374, 380 (Tex.App.2009) ("[T]rial by consent is precluded where proper objection is made on the record before submission to the jury.").

¶ 73 That said, we can find no fault with the trial court's alternative ground for allowing Davis to go forward on her punitive damages claim, that is, that GuideOne would not be prejudiced.

¶ 74 GuideOne asserts that it was necessarily prejudiced because it incurred a $1 million liability it would not have incurred had the amendment been disallowed. However, "[p]rejudice in this context means a lack of opportunity to prepare to meet the unpleaded issue." 6A Wright, Miller, & Kane, *Federal Practice and Procedure* § 1493, at 40–42.

¶ 75 Here, the record belies GuideOne's assertion that it was prejudiced. The record reveals that, throughout trial, Davis alleged that GuideOne conducted itself willfully and wantonly with respect to more than just its failure to comply with CAARA. GuideOne, at trial, never objected to these allegations or the evidence that supported them, or questioned whether they were intended to prove a punitive damages claim. And, contrary to its assertion, it presented its own evidence on these points.

¶ 76 In its brief, GuideOne identifies the "non-CAARA" evidence as concerning the "litigation conduct of GuideOne and its attor-

neys, none of which dealt with how GuideOne handled [Davis's] PIP claim." In this regard, Davis introduced evidence of GuideOne's bad faith conduct during litigation in that it had (1) provided two different certified copies of her policy; (2) falsely answered a request for admission; (3) placed language on a check releasing it from further liability; and (4) destroyed the original policy.

¶ 77 GuideOne responded to this evidence with evidence of its own, more specifically:

- GuideOne asked if there was any bad faith with respect to the certification of the policies, to which its expert responded there did not appear to be "any motive ... to disguise or defraud or somehow misrepresent what the coverage was here";

- It asked whether Davis had sustained any damages as a result of the certification of the first policy, to which the expert responded in the negative;

- It asked whether it had engaged in bad faith or unreasonable conduct with regard to the request for admission, to which the expert responded that the conduct was not unreasonable or misrepresentative;

- It asked whether it had acted unreasonably with regard to the language on the check that was "interpreted or suggested ... to be a final release of [GuideOne's] obligations," to which the expert again responded in the negative; and

- It asked for an opinion with respect to the effect of the destruction of the original file, to which the expert stated that he did not think having the original would have changed anything in the case.

GuideOne's expert provided reasons for each of these opinions.

¶ 78 Given GuideOne's failure to object to Davis's evidence, and its presentation of its own evidence on these issues, we, like the trial court, fail to perceive any prejudice to GuideOne in allowing the amendment of the complaint. Consequently, we perceive no abuse of the court's discretion in submitting the punitive damages issue to the jury.

### V. Attorney Fees Award

¶ 79 Finally, we reject GuideOne's contention that the trial court erred when it awarded Davis attorney fees in violation of former CAARA section 10–4–708(1.7)(c).

¶ 80 Under former section 10–4–708(1.7)(c)(I), a party was entitled to an award of attorney fees that was directly proportional to the degree he or she was successful with respect to a claim for PIP benefits. Although the jury had found that GuideOne failed to pay Davis's medical bills according to the requirements of the policy, it entered the number zero on a special interrogatory inquiring as to the total amount of medical bills that GuideOne should have paid. Accordingly, GuideOne argued that, because the jury did not award Davis any additional PIP benefits, she was "zero percent successful," for purposes of determining the extent to which she was entitled to recover attorney fees under the statute.

¶ 81 In its oral ruling, the trial court found:

- The jury "absolutely" and "clearly" found that GuideOne failed to pay medical bills covered under the policy and this verdict related to the PIP claim; however, by listing the total amount of unpaid bills as "zero," it had caused "some difficulty in the analysis of deciding what ... the level of success [Davis] has achieved";

- However, to determine that Davis "failed in any measure" to get an award of benefits would require a "most tortured and intellectually dishonest" analysis because the trial was "almost exclusively" about GuideOne's denial of benefits to pay medical bills;

- Davis presented a theory of economic damages at trial which was related to her benefits claim and the jury awarded economic damages in the amount of $905,000; and

- "Based on the evidence and theories presented to the jury, the only reasonable interpretation of [the jury's] answer to [the economic damages] question is that [it][was] doing [its] best to quantify the amount of benefits that should have been paid, and [it] quantif[ied] that at $90[5],000.... [T]he jury awarded a substantial amount—well into the six figures—for unpaid benefits under the policy.

¶ 82 In light of these findings, the court concluded, "[A]pply[ing] the analysis required under C.R.S. 10–4–708(1.7)(c)(I), the proportion of success of [Davis] on the PIP benefits for medical bills alone, is not merely 100 percent, but I believe is in the thousands of percentages."

¶ 83 Relying on *Brody v. State Farm Mutual Automobile Insurance Co.,* 194 P.3d 459 (Colo.App.2008), GuideOne also argued that Davis was not entitled to an award of statutory attorney fees because her attorneys could recover a far greater amount of fees from her under a contingency fee agreement. The court rejected this argument, noting that, unlike in *Brody,* the agreement between Davis and her attorneys provided the attorneys with "the option of pursuing either" contingent or statutory fees.

¶ 84 After noting that the fees requested by Davis were reasonable, and, indeed, "remarkably low" given the amount of litigation in the case, the court awarded her $344,680.25 in fees.

¶ 85 We review attorney fees awards for abuse of discretion. *US Fax Law Ctr., Inc. v. Henry Schein, Inc.,* 205 P.3d 512, 515 (Colo.App.2009).

¶ 86 On appeal, GuideOne reiterates the two arguments mentioned above.

¶ 87 GuideOne's first argument comprises, in its entirety, the following three sentences:

The jury verdict did not award [Davis] any PIP benefits, despite her claim for such amounts. Rather, the jury concluded that the benefits GuideOne had paid, were paid late. Accordingly, the court erred in concluding Ms. Davis was successful at trial so as to justify an award of attorney[ ] fees.

¶ 88 Notably absent is any attempt by GuideOne to develop an argument as to why the trial court's interpretation of the jury's findings was wrong. In our view, GuideOne's argument is insufficient to demonstrate error in the trial court's analysis of the issue. *See generally Telcordia Techs., Inc. v. Cisco Sys., Inc.,* 612 F.3d 1365, 1378 (Fed. Cir.2010) ("District courts have broad discretion to interpret an ambiguous verdict form, because district courts witness and participate directly in the jury trial process."); *see also CSX Transp., Inc. v. Miller,* 159 Md. App. 123, 858 A.2d 1025, 1083 (2004) ("If [the

party] wanted a weightier resolution of the issue, it should have mounted a weightier contention."); *cf. Holley v. Huang,* 284 P.3d 81, —— (Colo.App.2011) (declining to address "bald assertions of error that lack any meaningful explanation").

¶ 89 With respect to GuideOne's second argument, in *Brody,* a division of this court held that, pursuant to former section 10–4–708(1.7)(c), the plaintiff was entitled to only the fees that she was actually obligated to pay under the contingent fee agreement (i.e., a percentage of the "gross proceeds"), and not the total fees she claimed. 194 P.3d at 461–62. The decision turned on former section 10–4–708(1.7)(c)(III), which provided, "In no event shall ... an award of attorney fees [be entered] which is in excess of *actual* reasonable fees." (Emphasis added.) Because Brody's "actual" attorney fees were, under the contingency fee agreement, only $1,302.17, she was entitled only to a statutory award in that amount and not to the $106,280 in fees which would have been incurred, if accounted for on an hourly basis.

¶ 90 Here, Davis's fee agreement with counsel gave counsel the option of taking a certain percentage of the total recovery or the statutory attorney fee award. Because a contingent fee recovery here would have been much greater than the statutory award in this case, the statutory award could not have exceeded the statutory ceiling for "actual" fees under the contingent fee agreement involved in *Brody.*

¶ 91 Thus, we conclude that the trial court did not err in awarding attorney fees to Davis under former section 10–4–708(1.7)(c).

### VI. Attorney Fees on Appeal

¶ 92 Davis requests, and is entitled to, an award of attorney fees incurred on appeal pursuant to former section 10–4–708(1.7)(c). *See Giampapa v. Am. Family Mut. Ins. Co.,* 12 P.3d 839, 844 (Colo.App. 2000), *rev'd on other grounds,* 64 P.3d 230 (Colo. 2003); *see also Duhon v. Nelson,* 126 P.3d 262, 269 (Colo.App. 2005) ("When a party, pursuant to a statute, has been appropriately awarded attorney fees for a stage of the proceeding prior to the appeal, that party will be entitled to reasonable attorney fees for defending the

appeal."). Because the trial court is better situated to address the necessary factual determinations related to this request, we exercise our discretion under C.A.R. 39.5 and direct the trial court on remand to award Davis a reasonable amount of attorney fees incurred on appeal.

¶ 93 That part of the judgment reforming the policy to grant Davis unlimited PIP benefits is vacated, and the case is remanded to the trial court with directions to reform the policy consistently with the views expressed in this opinion and to award Davis a reasonable amount of attorney fees incurred on appeal. Otherwise, the judgment is affirmed in all respects.

Judge TAUBMAN and Judge FOX concur.