2012 COA 93

**Dale K. BITTLE and Patricia L. Bittle, Plaintiffs–Appellees and Cross–Appellants,**

v.

**CAM–COLORADO, LLC, Defendant–Appellant and Cross–Appellee.**

No. 11CA0766.

Colorado Court of Appeals, Div. V.

June 7, 2012.

Traylor, Tompkins & Black, P.C., Jerry B. Tompkins, Lance Phillip Timbreza, Grand

Junction, Colorado, for Plaintiffs–Appellees and Cross–Appellants.

The Hassler Law Firm, P.C., Alan N. Hassler, Grand Junction, Colorado, for Defendant–Appellant and Cross–Appellee.

Opinion by Judge HAWTHORNE.

¶ 1 In this adverse possession action, defendant, CAM–Colorado, LLC, appeals those parts of the judgment entered in favor of plaintiffs, Dale K. Bittle and Patricia L. Bittle, concluding that Mesa County is an indispensable party concerning CAM–Colorado's claim that three roads are public roads and also denying CAM–Colorado an easement of necessity. The Bittles cross-appeal the district court's order denying their post-trial C.R.C.P. 59(a) motion to amend the judgment to include a ruling pursuant to C.R.C.P. 15(b) as to whether the Bittles adversely possessed land referred to as parcel 4. We affirm the court's judgment as to the indispensable party and easement of necessity issues, but reverse the court's order denying the Bittles' C.R.C.P. 59(a) motion and remand the case to the district court to amend the judgment to include a ruling on the parcel 4 issue.

I. Facts

¶ 2 The Bittles are a married couple who live on land that they also use for farming and grazing livestock. They purchased the majority of their land in 1973, but acquired another small parcel in 1977. Their land abuts land owned by CAM–Colorado.

¶ 3 CAM–Colorado, also known as the Central Appalachian Mining Company–Colorado, is a coal company subsidiary. CAM–Colorado purchased property from Tavistock Partners, LLC—including the disputed property—after the Bittles initiated the present litigation. CAM–Colorado bought the land to use as a loading facility for coal trucked from the McClane Canyon Mine located twenty miles north, and then hauled out by train. At the time of trial, CAM–Colorado had not yet constructed the coal load-out facility, nor had it obtained the permits for building the rail lines.

¶ 4 The Bittles initiated this litigation by filing a complaint to quiet title to a portion of land to which Tavistock Partners held record title. The complaint alleged that the Bittles and their predecessors in title "fenced, farmed, grazed and with hostile character have lived visibly, obviously, openly, notoriously, continuously, exclusively and adversely possessed and used such property since 1949, or earlier." The complaint also stated that the disputed land's boundary "is delineated by existing fences and the precise location will be shown by survey."

¶ 5 Tavistock Partners denied the adverse possession claim, asserted a counterclaim for trespass, and sought an injunction against further trespassing by the Bittles. Once CAM–Colorado entered the case in place of Tavistock Partners, the district court granted it leave to file an amended answer and counterclaims. CAM–Colorado likewise asserted a counterclaim for trespass against the Bittles and sought an injunction against further trespassing by them. If the court were to find that the Bittles had adversely possessed its land, CAM–Colorado also claimed that it was entitled to an easement of necessity across the Bittles' land and a declaration that three roads that cross the Bittles' land are public roads.

¶ 6 During the bench trial, the Bittles presented evidence that they had adversely possessed the fenced land, as stated in their complaint. They also presented evidence that they had adversely possessed land next to the fenced land referred to as "parcel 4," which was bounded by a water drainage known as the Loma Drain.

¶ 7 The court entered judgment for the Bittles on their adverse possession claim with respect to the land expressly cited in their complaint. However, the court declined to rule on whether the Bittles had adversely possessed parcel 4 because the Bittles had not formally amended their complaint to include such a claim. The court also entered judgment for the Bittles on CAM–Colorado's trespass counterclaim and requests for an injunction and an easement of necessity. Finally, the court declined to rule on whether the three roads crossing the Bittles' land were public roads because the court deter-

mined that Mesa County was an indispensable party required to be joined in the litigation of that issue.

¶ 8 The Bittles filed a C.R.C.P. 59(a) motion to amend the judgment to conform to the evidence presented at trial, pursuant to C.R.C.P. 15(b). The court denied the motion because, based on its recollection of the evidence, the parcel 4 issue was not a focus of the Bittles' case.

¶ 9 CAM–Colorado appeals the court's determinations that Mesa County was an indispensable party and that CAM–Colorado was not entitled to an easement of necessity across the Bittles' land. The Bittles cross-appeal the court's order denying their C.R.C.P. 59(a) motion.

## II. County as Indispensable Party

¶ 10 CAM–Colorado contends that the district court erred in determining that Mesa County was an indispensable party that must be joined before it could determine whether the three roads on the Bittles' property were public roads. We disagree.

¶ 11 The district court made the following determinations as to the indispensable party issue:

Finally, I agree with Plaintiffs that I cannot decide whether 13.5 Road, L Road and L ¼ Road are publicly dedicated rights of way across Plaintiffs' property or whether the county has abandoned them because the county is a necessary party to this determination. It is not true, as Defendant contends, that a public road may be abandoned only by complying with § 43–2–303, C.R.S. *Board of County Commissioners v. Kobobel,* 74 P.3d 401, 406–407 (Colo. App.2002).... Colorado also recognizes common law abandonment. *Id.* at 407. It seems patently obvious that the county is an indispensable party to decide whether it has abandoned the roads in question. Without the county's presence, complete relief cannot be accorded between Plaintiffs and Defendant, Rule 19(a), C.R.C. P., because the county would not be bound by whatever decision I made. *Ross v. Old Republic Insurance Company,* 134 P.3d 505, 510 (Colo.App.2006), *affirmed in part*

*and reversed in part on other grounds,* 180 P.3d 427 (Colo.2008). Thus, I conclude that the county is an indispensable party on this issue, *see Dunav[a]nt v. Johnson,* 565 So.2d 198 (Ala.1990) (county held indispensable party to boundary dispute involving alleged abandonment of public road), and decline to decide it in the county's absence.

¶ 12 We may not overturn a district court's resolution of an indispensable party issue unless it reflects a clear abuse of discretion. *Hicks v. Joondeph,* 232 P.3d 248, 252 (Colo.App.2009). Whether a party is characterized as indispensable—and must therefore be joined—is a mixed question of law and fact and depends on the facts and context of each case. *Id.; I.M.A., Inc. v. Rocky Mountain Airways, Inc.,* 713 P.2d 882, 890 (Colo.1986); *Kobobel,* 74 P.3d at 408.

¶ 13 C.R.C.P. 19(a) provides, in relevant part:

Persons to be Joined if Feasible. A person who is properly subject to service of process in the action shall be joined as a party in the action if: (1) In his absence complete relief cannot be accorded among those already parties....

¶ 14 In *Woodco v. Lindahl,* 152 Colo. 49, 54–55, 380 P.2d 234, 238 (1963), the supreme court stated the test for indispensability:

Is the absen[t] person's interest in the subject matter of the litigation such that no decree can be entered in the case which will do justice between the parties actually before the court without injuriously affecting the right of such absent person?

Thus, an indispensable party has such an interest in the controversy's subject matter that a final decree between the parties cannot be made without affecting the nonparty's interests or leaving the controversy in such a situation that its final determination may be inequitable to the nonparty. *Id.* at 55, 380 P.2d at 238.

¶ 15 Accordingly, as a general matter, all parties who have an interest in property at issue in the litigation must be joined. *See Clubhouse at Fairway Pines, L.L.C. v. Fair-*

*way Pines Estates Owners Ass'n,* 214 P.3d 451, 454 (Colo.App.2008).

¶ 16 Here, CAM–Colorado argues that Mesa County is not an indispensable party because declaring the disputed roads to be public roads would "merely preserve[ ] the status quo" and not take anything away from the county. Rather, in its view, "[t]he County would continue to have authority to declare the road open, to undertake maintenance, or to overtly abandon or vacate the road." Thus, "the declaration would not be a burden on the County."

¶ 17 CAM–Colorado further argues that the district court could have entered the declaration on either of two grounds, neither of which would have injuriously affected the county: (1) the 1902 Road Petition, the 1908 Loma Townsite Plat, and the 1997 Wilcox Minor Subdivision "B" Plat, demonstrate that the roads became public by dedication; and (2) the roads are public by way of a public easement. Thus, according to CAM–Colorado, the district court could have, and should have, declared that the disputed roads were public insofar as they affect the Bittles' land. We are not persuaded.

¶ 18 Under common law, dedication of a public way by a private property owner is established by demonstrating (1) that the property owner unequivocally intended to make the dedication, and (2) that the dedication was accepted by the governmental authority. *Bd. of County Comm'rs v. Sherrill,* 757 P.2d 1085, 1087 (Colo.App.1987). The governmental authority's acceptance of a dedication may be evidenced by legislative act, or by the public entity's possession, improvement, or use of the land as a public road. *Id.*

¶ 19 Once a road is accepted by a governmental authority and used by the public, its status as a public road continues until vacation or abandonment. *Turnbaugh v. Chapman,* 68 P.3d 570, 573 (Colo.App.2003).

¶ 20 A county road may be vacated only by "a resolution approved by the board of county commissioners of the county." § 43–2–303(2)(b), C.R.S.2011. A county road may be abandoned either through relo-

cation and action by the board of county commissioners, *see* § 43–2–113, C.R.S.2011, or by common law abandonment, *Kobobel,* 74 P.3d at 407. Common law abandonment requires proof of nonuse and an intent to abandon. *Id.* Generally, whether a public road has been abandoned is a factual question. *Id.*

¶ 21 Here, the district court did not abuse its discretion in determining that Mesa County is an indispensable party. As previously stated, CAM–Colorado's first argument is that the county was not necessary to determine whether the disputed roads were public because the plats and road petition plainly demonstrate that the disputed roads were dedicated to the public. However, to conclude that the dedicated roads became public, the district court would have had to first conclude that Mesa County, as the governmental authority, had accepted the dedication. *Sherrill,* 757 P.2d at 1087. Moreover, because there was also evidence that the disputed roads either were not used, did not exist, or were vacated, the district court also would have had to rule on whether the roads, if properly dedicated and accepted, had been vacated or abandoned. *See Kobobel,* 74 P.3d at 407.

¶ 22 Each of these determinations necessarily implicates Mesa County's interests and could injure those interests if the district court were to declare the roads public (or nonpublic) when the county did not agree or have the opportunity to disagree with that declaration. *See Woodco,* 152 Colo. at 54–55, 380 P.2d at 238 (one is indispensable if "no decree can . . . do justice between the parties . . . without injuriously affecting the right of such absent [entity]").

¶ 23 For example, if the court were to declare the disputed roads public, then Mesa County could potentially be asked or required to undertake action with respect to the roads that it may not want to undertake, or could be exposed to liability for failing to take action required of it. *See Leach v. Manhart,* 96 Colo. 397, 400, 43 P.2d 959, 960 (1935) ("It devolves upon boards of county commissioners, and power to that end is granted by statute, to establish, maintain, and keep public roads open for travel.");

*Hallam v. City of Colorado Springs,* 914 P.2d 479, 482–83 (Colo.App.1995) ("[T]he General Assembly's purpose in not extending immunity to actions for injuries resulting from dangerous conditions of roads ... was to make governments liable for failure to maintain those facilities in a condition safe for public use."); *see also Boles v. Autery,* 554 So.2d 959, 961 (Ala.1989) ("The trial court's determination of whether the road was public or was private might affect not only the rights of the individual litigants but also the rights of members of the public to use the road, the duty of the county to maintain it, and the liability of the county for failure to maintain it."); *Wilson v. Berry,* 36 So.3d 559, 561 (Ala.Civ.App.2009) ("Because the evidence reflects that a question remains regarding whether it is still a public road, [the] County is an indispensable party to this action. The failure to join [the] County as a party could result in inconsistent judgments and impact the rights, duties, and liabilities of the litigants, members of the public, and the county.") (citations omitted); *Percha Creek Mining, LLC v. Fust,* 144 N.M. 569, 189 P.3d 702, 704 (App.2008) ("[W]e cannot avoid the reality that a declaration of the road as public directly and substantially impacts the County by imposing a statutory duty to maintain the road."); *Thieman v. Bohman,* 645 N.W.2d 260, 263 (S.D.2002) ("While the trial court indicated that [the plaintiff] was not attempting to force City to maintain the alley/road, that is the effect of declaring it to be a dedicated public alley/ road."); *Smith v. Albrecht,* 361 N.W.2d 626, 628 (S.D.1985) ("The county will also be responsible for the judicially declared public highway when that road becomes part of the county highway system."). Conversely, Mesa County's interests could be injured if the district court were to declare the roads private when the county believed it controlled the roads and wanted to maintain its control over them.

¶ 24 Furthermore, Mesa County is an indispensable party here because in its absence, the declaration would not be binding on the county, and complete relief could not be accorded between the parties. *See Ross,* 134 P.3d at 510 ("persons not parties to a judicial proceeding cannot be bound by the court's action therein"); *Smith,* 361 N.W.2d at 628 (without joining county as a party, county cannot be bound by declaration that a road is public).

¶ 25 Accordingly, the district court did not abuse its discretion in determining that Mesa County was an indispensable party. *See Clubhouse at Fairway Pines,* 214 P.3d at 454 (generally, all parties who have an interest in property at issue in litigation must be joined). Having so concluded, we need not consider whether the county is also indispensable with respect to CAM–Colorado's alternative argument that the roads are public by being public easements.

### III.  Easement of Necessity

¶ 26 CAM–Colorado contends that, for two reasons, the district court erred in denying its request to recognize an implied easement of necessity on the land the Bittles adversely possessed: (1) CAM–Colorado proved the three requirements needed to establish an easement of necessity; and (2) its western land is a separate parcel from its other land such that "each ... parcel[ ] is entitled to its own access, not reliant upon the access across other parcels under common ownership." We are not persuaded.

¶ 27 As an initial matter, we do not address CAM–Colorado's second argument regarding its parcels being separately owned because it has not shown, nor can we find, that this argument was raised in and ruled on by the district court. *See Wisehart v. Zions Bancorporation,* 49 P.3d 1200, 1204 (Colo.App.2002) ("[T]his court will not consider arguments not presented to the trial court.").

¶ 28 At a bench trial, a district court assesses the evidence and determines the witnesses' credibility. *Campbell v. Summit Plaza Associates,* 192 P.3d 465, 469 (Colo.App.2008). The witnesses' credibility and the inferences and conclusions to be drawn from the evidence are within the district court's province, and we will not disturb those findings on appeal unless they are clearly erroneous. *Id.* However, we review de novo a district court's legal conclusions and application of governing legal standards.

*Citywide Banks v. Armijo*, 313 P.3d 647, 649 (Colo.App.2011).

¶ 29 To establish an implied easement of necessity for access to land, three requirements must be met: (1) there must be unity of ownership of the entire tract prior to division; (2) the necessity for the easement must exist at the time the unity of ownership is severed; and (3) the necessity for the particular easement must be great because "implied easements have not been looked upon with favor by the courts," *Wagner v. Fairlamb*, 151 Colo. 481, 484, 379 P.2d 165, 167 (1963). *Thompson v. Whinnery*, 895 P.2d 537, 540 (Colo.1995).

¶ 30 As to the second requirement, the Restatement (First) of Property § 484 cmt. b (1944)—which the supreme court cited in reviewing an asserted easement of necessity— provides further explanation:

> The extent of an easement created by implication is to be inferred from the circumstances which exist at the time of the conveyance and give rise to the implication. Among these circumstances is the use which is being made of the dominant tenement at that time. Yet it does not follow that the use authorized is to be limited to such a use as was required by the dominant tenement at that time. It is to be measured rather by such uses as the parties might reasonably have expected from future uses of the dominant tenement. What the parties might reasonably have expected is to be ascertained from the circumstances existing at the time of the conveyance. It is to be assumed that they anticipated such uses as might reasonably be required by a normal development of the dominant tenement. It is not to be assumed, however, that they anticipated an abnormal development. Hence, the scope of an easement created by implication does not extend to uses required by such development.

*Accord Thompson*, 895 P.2d at 541, 542 n. 9.

¶ 31 As to the third requirement, there must be "a practical inability to have access any other way than by a way of necessity." *Id.* at 541 (quoting *Wagner*, 151 Colo. at 487, 379 P.2d at 168). Thus, although absolute physical impossibility of reaching the alleged dominant estate is not required, there can be no easement of necessity if there are alternatives offering reasonable means of ingress and egress. *LeSatz v. Deshotels*, 757 P.2d 1090, 1092 (Colo.App. 1988) (no easement of necessity where the plaintiff could obtain a license to construct a foot or vehicular bridge over the canal).

¶ 32 The person claiming an implied easement of necessity bears the burden of proving such an easement exists. *Thompson*, 895 P.2d at 540.

¶ 33 Here, the district court properly denied CAM–Colorado's claim for an implied easement of necessity. As stated, the necessity for the easement must have existed at the time the unity of ownership was severed. *Id.* With respect to land acquired by adverse possession, title vests in the adverse possessor once the statutory eighteen-year period has elapsed. *See* § 38–41–101(1), C.R.S.2011; *Hunter v. Mansell*, 240 P.3d 469, 475 (Colo.App.2010). Thus, because the district court found that the Bittles had possessed the land since at least 1977, the latest date by which the severance occurred was 1995. Therefore, 1995 is the relevant date for considering CAM–Colorado's need for the implied easement and any reasonable future uses for such an easement.

¶ 34 CAM–Colorado has not pointed to any evidence in the record indicating that, at the time of severance in 1995, it or its predecessors in title were using their land in a manner that would necessitate access through the adversely possessed property. Indeed, the district court found, with record support, that CAM–Colorado's expert stated at the 2010 trial that CAM–Colorado's need for the easement was mainly "for future purposes." *Cf. Wagner*, 151 Colo. at 487, 379 P.2d at 169 (depressed condition of mining industry did not obviate pre-existing necessity for easement). Nor has CAM–Colorado pointed to any record evidence indicating that in 1995 the Bittles might reasonably have expected that CAM–Colorado or its predecessors would need access through their land for constructing and maintaining a rail spur to load coal from a mine located twenty miles north. Thus, because CAM–Colorado has

not demonstrated that it met its burden of proving the second requirement for an implied easement of necessity, the district court did not err in denying its request to recognize such an easement.

¶ 35 CAM–Colorado likewise has not demonstrated that it met its burden of proving the third requirement of great need because it has not pointed to evidence in the record showing that there are no alternatives offering reasonable means of ingress and egress. *See LeSatz,* 757 P.2d at 1092. To the contrary, one of CAM–Colorado's land survey experts testified that he could access the western portion of CAM–Colorado's property without crossing the Bittles' property by crossing the Reed Wash and the Loma Drain, two water drainages that cross CAM–Colorado's property, but that it would be "much easier" to access from the Bittles' property. Likewise, another one of CAM–Colorado's land survey experts testified that he accessed CAM–Colorado's western property on foot by crossing the Reed Wash and the Loma Drain, which separate the western and eastern portions of CAM–Colorado's property.

¶ 36 Additionally, a mining engineer for CAM–Colorado's parent company testified that for CAM–Colorado to use its western property for the "future purposes" of constructing and maintaining a rail line, it would need to either widen its existing railroad bridge, build a new bridge, or cross the Bittles' property. However, CAM–Colorado could currently access its western property by walking across the drainages.

¶ 37 Thus, CAM–Colorado is similarly situated to the plaintiff in *LeSatz* who sought an implied easement of necessity to access a portion of his land that was cut off from the other portion of his land by a canal. *LeSatz,* 757 P.2d at 1091. The *LeSatz* division reasoned that the plaintiff could have obtained a license to construct a foot or vehicular bridge to cross the canal. *Id.* at 1092. The division noted that there was no evidence that the cost of such construction would be prohibitive or grossly exceed the value of the plaintiff's property. *Id.* Here, too, there is no evidence that widening the current bridge or building a new bridge would be cost-prohibitive to

CAM–Colorado or would grossly exceed its property's value. Thus, CAM–Colorado has not demonstrated that it met its burden of proving the third requirement for an implied easement of necessity.

¶ 38 Accordingly, the district court did not err in denying CAM–Colorado's request for an implied easement of necessity.

### IV. Cross–Appeal: Adverse Possession of Parcel 4

¶ 39 The Bittles contend that the district court abused its discretion in denying their C.R.C.P. 59(a) motion to amend the judgment to include a ruling on whether they had adversely possessed the property bordered by the Loma Drain referred to as parcel 4. We agree.

¶ 40 As an initial matter, we reject CAM–Colorado's argument that, pursuant to *Wilcox v. Reconditioned Office Systems of Colorado, Inc.,* 881 P.2d 398 (Colo.App.1994), the Bittles' motion was procedurally barred because they did not move to set aside or vacate the judgment. *Wilcox* is inapposite as the division there addressed whether a plaintiff should be permitted to amend pleadings under C.R.C.P. 15(a) after default judgment had entered, and the plaintiff had not filed his amended complaint within fifteen days after entry of the default judgment as C.R.C.P. 59 requires. *Id.* at 400. Here, the Bittles were seeking to amend under C.R.C.P. 15(b), there was no default judgment, and they timely filed a C.R.C.P. 59(a) motion. Thus, *Wilcox* does not apply.

¶ 41 Absent an abuse of discretion, we will not disturb a district court's denial of a C.R.C.P. 15 motion. *Gabel v. Jefferson County Sch. Dist. R–1,* 824 P.2d 26, 32 (Colo. App.1991).

¶ 42 C.R.C.P. 15(b) provides, in relevant part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any

party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

¶ 43 A district court has the duty to consider an issue raised by the evidence even if the matter was not pled and no formal application was made to amend. *Padilla v. Ghuman*, 183 P.3d 653, 658 (Colo. App.2007). Where a party fails to object to the presentation of evidence concerning the issue, it cannot later complain of failure to amend the pleadings. *Id.* "Rule 15(b) has been interpreted to provide that when an issue is tried before the court without timely objection or motion, then the issue is deemed properly before the court despite any defect in the pleading." *Great Am. Ins. Co. v. Ferndale Dev. Co.*, 185 Colo. 252, 254, 523 P.2d 979, 980 (1974). Indeed,

[a] party who knowingly acquiesces in the introduction of evidence relating to issues that are beyond the pleadings is in no position to contest a motion to conform [the pleadings to the evidence]. Thus, consent is generally found when evidence is introduced without objection, or when the party opposing the motion to amend actually produced evidence bearing on the new issue or offered arguments directly contesting the issue.

6A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1493, at 26–27, 30 (2010) (footnote omitted); *cf. Davis v. GuideOne Mut. Ins. Co.*, 2012 COA 70, ¶ 72, 297 P.3d 950 (no trial by consent where party objected to introduction of evidence twice before trial and again when the issue was raised following the close of evidence, but did not object at the moment the evidence was introduced).

¶ 44 Nevertheless, a district court should grant a C.R.C.P. 15(b) amendment only when there is no reasonable doubt that the issue has been intentionally and actually tried. *Real Equity Diversification, Inc. v. Coville*, 744 P.2d 756, 759 (Colo.App. 1987). "It is not enough that some evidence has been received germane to the issue sought to be raised." *Id.* (quoting *Clemann v. Bandimere*, 128 Colo. 24, 29, 259 P.2d 614, 616 (1953)).

¶ 45 Here, in its order entering judgment, the district court made the following determinations regarding parcel 4:

Were I to decide it, parcel 4 would present a closer question, as this parcel is only partially fenced. Plaintiffs have relied on the Loma Drain to close the gap between the two fence segments on parcel 4. I found no reported cases in Colorado directly addressing whether a natural barrier may substitute for a manmade one in adverse possession cases. The closest I found is the reference in [*Beaver Creek Ranch, L.P. v. Gordman Leverich Ltd. Liab. Ltd. P'ship*, 226 P.3d 1155, 1161 (Colo.App.2009) ], to "boundaries ... established by fences or *other barriers.*"

The majority rule seems to be that natural features may suffice to enclose property claimed by adverse possession. *E.g., Vezey v. Green*, 35 P.3d 14, 24 (Alaska 2001); *Schultz v. Dew*, 564 N.W.2d 320, 323 (S.D. 1997); *Williams v. Hufstedler*, 14 Ark. App. 274, 276, 687 S.W.2d 531, 532 (Ark. App.1985); *Dierks Lumber & Coal Co. v. Vaughn*, 131 F.Supp. 219, 228 (E.D.Ark. 1954), *affirmed*, 221 F.2d 695 (8th Cir. 1955) (applying Arkansas law); *Palin v. Sweitzer*, 8 Cal.2d 329, 331, 65 P.2d 351 (Ca.1937).

I need not decide this question, since, as noted above, Plaintiffs' complaint seeks title by adverse possession only to land "the boundary of which is delineated by existing fences" (Exhibit A to complaint). This claim was never amended either expressly or in the trial management order to include property bounded by anything other than fences.

¶ 46 The Bittles subsequently filed a timely C.R.C.P. 59(a) motion to amend the judgment pursuant to C.R.C.P. 15(b). However, the court denied the motion as follows:

I am not convinced beyond a reasonable doubt that Plaintiffs' claim to parcel 4 was intentionally and actually tried. According to Defendant CAM–Colorado's trial brief, it "believe[d] the Plaintiff is attempting to quiet title based on the location of 3 fences".... Plaintiffs' trial brief uses the word "fence" or some variation of it six times but makes no mention at all of natu-

ral barriers. Similarly, the Amended Trial Management Order refers to fences ... but not to natural barriers.

Although imperfect, my recollection of the evidence is that it mentioned the natural barrier on Parcel 4 but that this was not a focus of Plaintiffs' case, and that Defendant CAM–Colorado emphasized that Parcel 4 was not completely fenced. During closing argument, counsel for Defendant CAM–Colorado pointed out that Plaintiffs' complaint sought title only to the east fence, not to the natural boundary of the Loma Drain, and argued that as a matter of law, the Loma Drain could not serve as the perimeter of a parcel acquired by adverse possession.

¶ 47 Based on our review of the opening statements, evidence presented, and closing arguments, we conclude that the court abused its discretion in denying the Bittles' C.R.C.P. 59(a) motion because the parcel 4 issue was actually and intentionally tried by both parties. Specifically, the following evidence and arguments were presented:

- During opening statements, the Bittles' lawyer stated that the natural drain (i.e., the Loma Drain) was a boundary of the Bittles' property. He also stated that the Bittles and their predecessors used the land "up to the drain."
- Dale Bittle stated multiple times during his testimony that the east boundary of his property was the Loma Drain.
- Dale Bittle testified multiple times to parcel 4's characteristics, including that it was a wetland with a riparian strip through it, that it was good for light grazing, that it had saturated soil conditions, and that it was fragile and pristine.
- During his testimony, Dale Bittle placed an "X" on the Loma Drain shown on Exhibit 27A marking the east boundary of his property.
- During Dale Bittle's testimony, he also stated that:
  — he and the previous owner of his property grazed livestock up to the Loma Drain;
  — the previous owner believed he owned all the property up to the Loma Drain;
  — he believed he purchased all the property up to the Loma Drain;
  — he grazed animals on parcel 4 every year, and he helped start both a youth and women's hunting program on that land; and
  — the previous owner's and his use of parcel 4 had been consistent as long as he had known the property.
- On cross-examination, CAM–Colorado's lawyer questioned Dale Bittle about his use of parcel 4.
  — CAM–Colorado's lawyer asked Dale Bittle about what animals he grazed on parcel 4 and how often he grazed them.
  — In response, Dale Bittle testified that he grazed both cows and horses on parcel 4, but that he practiced "rest rotation" on that land because it was so fragile, that is, he regulated the number of days and the number of species that he would allow to graze on it.
- Dale Bittle's son, Steve Bittle, also testified that:
  — the Loma Drain was always an established boundary line;
  — parcel 4 had always been used for grazing;
  — his family also used, and still continued to use, parcel 4 for commercial hunting of birds;
  — his family let the Division of Wildlife start a youth hunter program on parcel 4; and
  — they used parcel 4 for grazing or hunting every year.
- Butch Vanlandigham, whose father was Dale or Patricia Bittle's cousin, testified that:
  — his father grazed cattle on the Bittles' land, including parcel 4;
  — he and his family would go to the Bittles' house; and
  — "[W]hy would you be there if you didn't have permission?" in response

to the question, "Do you know whether your dad got permission from Mr. Bittle to run cattle on the property?"

- In closing arguments, the Bittles' lawyer cited cases and argued that it was not necessary for property to be fenced to satisfy the adverse possession requirements. Rather, he argued that property simply needed to be actually and exclusively used.
- In closing arguments, the Bittles' lawyer noted that portions of the property across the drain are not used as much as other portions of the property because of the type and nature of that property.
- In closing arguments, CAM–Colorado's lawyer discussed at length how Dale Bittle and Steve Bittle testified that the eastern boundary of the Bittles' and their predecessor's property had always been the Loma Drain.
- In closing arguments, CAM–Colorado's lawyer noted that the complaint alleged that the eastern boundary of the Bittles' property was the fence, but that the testimony at trial indicated that the eastern boundary was the Loma Drain. He then argued that the discrepancy showed that "there's some confusion in the plaintiff's mind as to whether it's the east fence or the Loma Drain," which demonstrated that a "next door" property owner would not know which boundary the Bittles are trying to establish as the east boundary and that the boundary would not be open and notorious.
- In closing arguments, CAM–Colorado's lawyer argued that because the property extending to the Loma Drain was not fenced, it could not be adversely possessed.
- In closing arguments, CAM–Colorado's lawyer argued that the testimony about the Loma Drain boundary showed that no property was adversely possessed because "[t]he interior fences then lose all their validity as part[,] as a perimeter fence."
- Exhibit 27A is a transparent sheet to be placed over a map of the Bittles' and CAM–Colorado's properties. The exhibit delineates parcels 1 through 4, indicating that they are presumably the disputed property. When the exhibit is placed over the appropriate map, parcel 4 is shown as extending to the Loma Drain.

¶ 48 Thus, our record review indicates that the parcel 4 issue was actually and intentionally tried by both the Bittles and CAM–Colorado. The record also demonstrates that CAM–Colorado never objected to the Bittles' presenting evidence and argument regarding the parcel 4 issue. *See Padilla,* 183 P.3d at 658 ("Where a party fails to object to the presentation of evidence concerning the issue, it cannot complain on appeal of failure to amend the pleadings."). To the contrary, CAM–Colorado's lawyer cross-examined Dale Bittle about parcel 4 and argued at length in closing arguments that the evidence regarding parcel 4 and the Loma Drain boundary demonstrated that the boundaries of the Bittles' land were unclear, and therefore there could be no adverse possession of any of CAM–Colorado's land. Thus, not only did CAM–Colorado's lawyer not object to the parcel 4 evidence, but he used that evidence to argue against adverse possession of all the disputed parcels.

¶ 49 Moreover, the district court's original order entering judgment indicates that the parcel 4 issue was tried. The order states that the parcel 4 issue presented "a closer question," notes that "[p]laintiffs have relied on the Loma Drain to close the gap between the two fence segments on parcel 4," discusses the unique characteristics of the parcel 4 issue and the nature of parcel 4's boundaries, and provides law and analysis of the issue. Thus, although the court declined to rule on the parcel 4 issue because the Bittles had not expressly amended their complaint or trial management order, the court's order supports the conclusion that the issue was actually tried.

¶ 50 Finally, we note that CAM–Colorado's reliance on *Polk v. Denver District Court,* 849 P.2d 23 (Colo.1993), and *Ajay Sports, Inc. v. Casazza,* 1 P.3d 267 (Colo.App.2000), is misplaced. Both cases addressed the denial of motions brought under C.R.C.P. 15(a) and not C.R.C.P. 15(b). *Polk,* 849 P.2d at 25; *Ajay Sports, Inc.,* 1 P.3d at 273.

¶ 51 Accordingly, we conclude that the court abused its discretion in denying the Bittles' C.R.C.P. 59(a) motion.

¶ 52 The judgment entered as to the indispensable party and easement of necessity issues is affirmed. The order denying the Bittles' C.R.C.P. 59(a) motion is reversed, and the case is remanded to the district court to amend the judgment to include a ruling on the parcel 4 issue.

Judge LOEB and Judge MILLER concur.